(No. 16349.—Reversed and remanded.)
THE LIMITS INDUSTRIAL RAILROAD COMPANY, Appellee, *vs.*
THE AMERICAN SPIRAL PIPE WORKS, Appellant.

*Opinion filed April 23, 1926.*

1. EMINENT DOMAIN—*courts cannot inquire into necessity for
condemnation if for public use.* Courts cannot inquire into the
necessity or propriety of the exercise of the right of eminent do-
main provided it is for a public use, as that is a legislative ques-
tion, and when the legislature, by itself or by an agency to which
authority for the purpose has been lawfully delegated, has decided
the cases in which the power may be exercised, the court may not
interfere with the decision.

2. SAME—*exercise of the power of eminent domain must be for
benefit of general public.* The use that will justify the taking of
private property by the power of eminent domain is the use by or
for the government, the general public or some portion of it and
not the use by or for particular individuals; but the use may be
limited to the inhabitants of a small locality, provided the bene-
fit is in common and not to a very few persons or estates.

3. SAME—*whether property is being taken for public or for pri-
vate use is a question for the courts—Commerce Commission.* The
question whether property is sought to be taken for a private or a
public use must be decided by the court when raised on motion to
dismiss the petition for condemnation; and where the petitioner is
a newly organized corporation, the findings of the Commerce Com-
mission, its certificate of convenience and necessity and its ap-
proval of the issue of capital stock are in no way conclusive.

4. SAME—*railroad cannot condemn private property for spur-
track for private use.* A railroad company cannot condemn private
property for a spur-track for the purpose of connecting a particu-
lar plant or industry, or a small group of such, with the main line
of its road for the private benefit of the plant or industry and of
the railroad company, as such a use would not be a public use of
the property.

5. SAME—*railroad cannot be organized to condemn property for
private use.* As a railroad company cannot condemn private prop-
erty for the construction of a spur-track to connect its line with a
particular industrial plant or track, the same purpose cannot be
accomplished by the organization of another railroad company to
build and operate such track, which is not long enough or so situ-
ated as to be able to serve any other purpose.

6. SAME—*when condemnation of private property is not shown to be for public use as a freight terminal.* The condemnation of private property for the construction of a spur-track between a terminal railroad company and a particular industrial plant or tract is not shown to be justified as being for public use in affording a terminal for a universal freight station in the Chicago terminal district, where such station would not be able to give the necessary service connection with all the railroads in the district and where other and better facilities are available.

APPEAL from the Superior Court of Cook county; the Hon. E. M. MANGAN, Judge, presiding.

HERRICK, VETTE & PEREGRINE, for appellant.

Mr. CHIEF JUSTICE DUNN delivered the opinion of the court:

The Limits Industrial Railroad Company was incorporated on December 4, 1922, with a capital stock of $10,000, for the purpose of constructing a railroad from a point in the right of way of the Baltimore and Ohio Chicago Terminal Railroad Company about 730 feet to Forty-seventh avenue. It filed a petition in the superior court of Cook county for the condemnation for its right of way of a strip of land 17 feet wide, being 8.5 feet on each side of a line commencing at a point in the west line of the Baltimore and Ohio Chicago Terminal railroad 4.98 feet west of the center line of the main track and 204 feet south of the south line of West Fourteenth street; thence northwesterly, on a curved line having a radius of 287.93 feet concave to the left, 262.03 feet to a point in the south line of West Fourteenth street, said point being 153.7 feet west from the center line of the Baltimore and Ohio Chicago Terminal railroad main track measured along the south line of West Fourteenth street and 469.9 feet east of the west line of South Forty-seventh avenue measured along the south line of West Fourteenth street, said 17-foot strip being continued, with the same curved boundaries, to an intersection of the center line of West Fourteenth street, thence west along

the center line of West Fourteenth street to the west line of South Forty-seventh avenue. The names of the persons interested, as owners or otherwise, in the premises described were stated to be the American Spiral Pipe Works, the Greenlee Foundry Company, Augustus S. Peabody, trustee, and Francis R. Dickinson, successor in trust. The defendants appeared and moved to dismiss the petition, and the petition was afterward dismissed by the petitioner as to all the defendants except the American Spiral Pipe Works, which filed an amended motion to dismiss, on the ground, among others, that the purpose for which condemnation was sought was a private and not a public use. Upon the hearing of this motion it was denied, and the cause was afterward tried before a jury for the ascertainment of compensation and damages. The pipe works filed a cross-petition, averring that it was the owner of a contiguous tract of seventeen acres, of which the premises sought to be condemned were a part, upon which was the manufacturing plant of the pipe works; that the part of the premises which it was not sought to condemn would be greatly damaged by reason of the taking of the land sought to be condemned and praying that such damages be also ascertained. On the trial the jury assessed the compensation for the land taken at $3102.30 and the damages to the remainder of the tract at $15,000. A judgment was entered authorizing the petitioner to take possession of the land upon payment of these amounts within forty-five days after the entry of the judgment, and the pipe works appealed.

No question is made as to the trial before the jury, and the principal question presented is the error assigned on the action of the trial court in overruling the motion to dismiss the petition. No brief has been filed on the part of the appellee.

Much evidence was introduced on this question, from which it appears that John O. Hruby had been engaged in the real estate business for about fifteen years and about

three years before these proceedings he obtained an option for the purchase of a vacant ten-acre tract of land lying between West Thirteenth street and West Fourteenth street on the north and south and between South Forty-seventh avenue and South Forty-eighth avenue (or Cicero avenue) on the east and west, from Eaton, the owner, and certain of his associates, who were known as the Eaton syndicate. East of this tract, on the other side of South Forty-seventh avenue, on the north side of West Fourteenth street, extending from Forty-seventh avenue to the right of way of the terminal company, was the foundry of the Greenlee Foundry Company. On the south side of West Fourteenth street, extending from South Forty-seventh avenue to the right of way of the terminal company, was a twenty-acre tract, seventeen acres of which were occupied by the American Spiral Pipe Works, the rest of the twenty acres being occupied by streets taken off of the tract and the right of way of the terminal company. At the time of the filing of the petition and of the trial three parcels in the ten-acre tract had been sold by Hruby: one to the Dearborn Truck Company, one to the Fire Protection Company and one to the Borin Manufacturing Company. There was no building on the premises except one built by the Dearborn Truck Company. After securing his option on the ten-acre tract Hruby tried to arrange for connections with the terminal company over the foundry company property but was unable to make any arrangement for that purpose, and he also made an unsuccessful effort to obtain a private switch over the property of the pipe works. Thereupon he conceived the idea of organizing an independent railroad company. The president of the company was a track superintendent who had no office, who laid tracks for anybody who wanted switch-tracks laid, and Hruby, at the time he testified, did not know where the president was. E. H. Seymour, another of the five directors, was a night watchman in a garage on Randolph street. A third director, Stephen S. Mack,

was a real estate salesman employed by Hruby. Hruby himself was secretary and general manager of the Limits Industrial Railroad Company. From the terminal company tracks to West Fourteenth street the proposed railroad would extend 262 feet over the northeast corner of the property of the pipe works, and from its entrance on West Fourteenth street it would extend 470 feet to the west line of South Forty-seventh avenue. The railroad company applied to the Illinois Commerce Commission for an order authorizing the issuance of its capital stock and for a certificate of convenience and necessity, and on January 17, 1923, the order was entered and the certificate of convenience and necessity issued. The application to the commission stated that the railroad, when constructed, would connect with the tracks of the Baltimore and Ohio Chicago Terminal Railroad Company, which has a belt line in the city of Chicago reaching to various points of the United States, and that the Limits Industrial Railroad Company would serve an important industrial district which is now without direct railroad communication; that the district to be served comprises a ten-acre tract of land located in the town of Cicero, in Cook county, bounded by West Thirteenth street, South Forty-seventh avenue, West Fourteenth street and South Cicero avenue, sometimes known as South Forty-eighth avenue.

The court cannot inquire into the necessity or propriety of the exercise of the right of eminent domain, which is the power to take private property without the consent of the owner upon making just compensation therefor. That is a legislative question, and when the legislature, by itself or by an agency to which authority for the purpose has been lawfully delegated, has decided the cases in which the power may be exercised, the courts may not interfere with the decision. On the other hand, it is only for a public use that the legislature can authorize private property to be taken, and any attempt to grant the right to take pri-

vate property for a use not public is unconstitutional and void. (*Litchfield and Madison Railway Co.* v. *Alton and Southern Railroad,* 305 Ill. 388; *Chicago, Milwaukee and St. Paul Railway Co.* v. *Franzen,* 287 id. 346.) The question whether the use to which it is sought to apply private property by the exercise of the power of eminent domain is a public use is therefore a judicial question, and whenever the right to take private property by the exercise of that power is challenged because the use for which the property is sought to be taken is not a public use, the court must decide the question. The findings of the Commerce Commission, its certificate of convenience and necessity and its approval of the issue of the capital stock of the railroad company are therefore in no way conclusive, and the question whether the proposed use was public or not was open for the consideration of the court on the motion to dismiss the petition.

The terminal company could not have condemned the land either of the foundry company or the pipe works for a track from its railroad to the ten acres in question for the exclusive use of the owners of the tract, for such a track would have been a mere spur-track of the terminal company for a wholly private use. (*Chicago and Eastern Illinois Railroad Co.* v. *Wiltse,* 116 Ill. 449; *Sholl* v. *German Coal Co.* 118 id. 427; *Litchfield and Madison Railway Co.* v. *Alton and Southern Railroad, supra; Pere Marquette Railroad Co.* v. *United States Gypsum Co.* 154 Mich. 290.) In *Chicago and Eastern Illinois Railroad Co.* v. *Wiltse, supra,* the railroad company sought to condemn a right of way for a track extending from its main line three-fourths of a mile to a plant engaged in the manufacture of brick. The evidence showed that the sole purpose of the proposed track was to reach the brick works and thereby create a feeder to the railroad company's main line, and it was held that such proposed track was a spur-road intended for the use indicated, and that the railroad company had no authority

to appropriate private property to such use by the power of eminent domain.

In *Litchfield and Madison Railway Co.* v. *Alton and Southern Railroad, supra,* the two railroads ran parallel for half a mile beside a large manufacturing plant, the Litchfield and Madison Company's track being separated from the plant by the right of way of the Alton and Southern, 80 feet wide. The Litchfield and Madison Company desired to secure the right to cross the Alton and Southern in order to connect its main line with an industrial switch of the plant, and having obtained from the Public Utilities Commission an order authorizing the crossing, began a proceeding to have the compensation to the Alton and Southern assessed. The respondent opposed the right to condemn, for the reason that the proposed connection and crossing were to be constructed for the exclusive use of the manufacturer, and that the condemnation was therefore sought not for a public use but for a private use. This view was sustained by this court and the judgment of condemnation was reversed.

Clearly, a railroad company cannot condemn private property for a spur-track for the purpose of connecting a particular plant or industry, or a small group of such, with the main line of its road for the private benefit of the plant or industry and of the railroad company. Such a use would not be a public use of the property but a private use for the private profit of the plants or industries affected and of the railroad company. (*Sanitary District* v. *Corneau,* 257 Ill. 93; *Pittsburg, Wheeling and Kentucky Railroad Co.* v. *Benwood Iron Works,* 31 W. Va. 710; *Railway Co.* v. *Vencill,* 73 id. 650; *Kyle* v. *Texas and New Orleans Railroad Co.* 3 Tex. App. (Willson) 518; *People* v. *Pittsburg Railroad Co.* 53 Cal. 694.) The use that will justify the taking of private property by the power of eminent domain is the use by or for the government, the general public or some portion of it, and not the use by or for particu-

lar individuals or for the benefit of certain estates. The use may be limited to the inhabitants of a small locality, but the benefit must be in common and not to a very few persons or estates. (*McQuillan* v. *Hatton*, 42 Ohio St. 202; *Coster* v. *Tide Water Co.* 18 N. J. Eq. 55; *Talbot* v. *Hudson*, 16 Gray, 417.) If private property cannot be condemned directly for the purpose of a spur-track reaching a particular industrial plant or tract, the proposition can scarcely require argument to support it that the law will not permit this identical thing to be accomplished indirectly by the subterfuge of organizing a railroad company for the ostensible purpose of constructing and operating a railroad between the railroad already existing and the plant.

It is manifest that the appellee was not organized to serve the general public or any public purpose. The proposed railroad which it was organized to build was to be only about 730 feet long, two-thirds of that distance being in a public street. It could serve no need of any property on either side of the road, for all the other property was occupied by the foundry and the pipe works, which were both contiguous to the terminal company's railroad and had all the railroad connections they could use. No man having any connection with railroad operation appears to have been connected with the organization, and the purpose which the promoters of the company had in mind in the organization of the corporation is indicated, beyond question, by the statement in their application to the Commerce Commission for authority to issue capital stock and for a certificate of convenience and necessity, that "said railroad, when so constructed, will connect with the tracks of the Baltimore and Ohio Chicago Terminal Railroad Company, which has a belt line in the city of Chicago reaching and connecting with a large number of other railroads to various points in the United States, and that the railroad of said Limits Industrial Railroad Company will serve an important industrial district which is now without direct railroad com-

munication; that the district to be served as aforesaid comprises a ten-acre tract of land located in the town of Cicero, in Cook county, Illinois, and bounded by West Thirteenth street, South Forty-seventh avenue, West Fourteenth street and South Cicero avenue, sometimes known as South Forty-eighth avenue."

The Commerce Commission in modifying the order on the application of the petitioner made the finding that there was a public demand and necessity for the establishment of a public freight-receiving station and a public team-track adjacent to a public street known as Forty-seventh avenue and on the ten-acre tract in question, upon which the proposed railroad has a terminus; that said property is private property, which the company can use, so far as needed, for that purpose, and that the company proposed to extend the facilities of the railroad by building a public team-track upon the property west of and along Forty-seventh avenue and by erecting a public freight-receiving station upon said property and adjacent to Forty-seventh avenue, at a point approximately 250 feet north of the north line of West Fourteenth street; that the company intends to use said team-track and public freight-receiving station, when constructed, in connection with its said railroad, and that such use thereof will be a matter of great accommodation, convenience and necessity to the public desiring to ship or receive freight in that vicinity and will result in profit and advantage to the company, and that the company can provide said team-track and erect said public freight-receiving station in connection with said railroad at a cost not to exceed $2000, and that public convenience and necessity require the construction and use thereof as aforesaid. The order of the commission was thereupon modified, about a month after the petition for condemnation was filed in this case, so as to reduce the amount of the proceeds of the stock to be used for the acquisition of right of way from

$5000 to $3000, and to consent that the $2000 of the proceeds thus released be used for the construction of a team-track and public freight-receiving station.

The operation of a public freight house is the only semblance of a public use for this railroad which is claimed to be in contemplation, and the evidence clearly shows that this claim is only a subterfuge to give color of right to the attempt to condemn land for the spur-track from Hruby's ten acres to the terminal company's railroad. On March 6, 1923, E. H. Seymour executed to the railroad company a lease of a tract 100 feet by 120 feet in the north 453 feet of the ten-acre tract, 33 feet west of South Forty-seventh avenue, for fifty years at $100 a year rent. Hruby testified that the lessor was the E. H. Seymour who was a director of the railroad company and a night watchman in a garage, and that he acquired title to the property before the lease from Eaton. The size of the proposed public freight house is 75 by 100 feet and its height between 12 and 14 feet above the platform grade. The railroad owns no cars, rolling stock or other railroad equipment or any other property except its lease for the freight house, its ordinance of the town of Cicero authorizing its occupation of the streets, its corporate franchise and its capital stock, $10,000.

Hruby, who had no experience in railroad operation, testified as to the use to be made of the team-track and freight house, that he was familiar with the industries in that locality that would have use for a track of this kind,— three of them right within this territory: the Dearborn Truck Company; the Fire Protection Company, dealing in fire and sprinkling apparatus, employing about 150 men; the Borin Manufacturing Company, engaged in the manufacture of mirrors and mirror frames, employing from 40 to 50 employees; that as to the industries which could use the public freight house, any industry located within a mile east, west and north, and say half a mile south, that ships in quantities less than car-load lots, could ship from this

freight house very advantageously. In the vicinity of this public team-track and public freight house are R. F. Conway & Co., paving contractors, Mudge & Co., railway supplies, and the Harmon Electric Company, electrical contractors.

On the question whether there was any public need for a public freight house and team-track, five other witnesses testified for the railroad company. Hugo D. Loeb, whose business was dealing in industrial real estate, testified that to develop the ten-acre tract for industrial purposes would require a series of tracks running into or adjacent to it; that near to it are the plants of the Jones Foundry Company, two or three blocks to the east, the Armstrong Paint and Varnish Company, three blocks east and on the other side of the Belt railroad and the Chicago and Western Indiana railway, and having a switch of its own, and the plant of the Truscon Steel Company.

H. P. Hartsack, traffic manager for Mudge & Co., makers of railway supplies, whose plant was six blocks from the proposed freight house, testified that the freight house would be very convenient for the purposes of Mudge & Co. for shipping freight in less than car-load lots, because the freight house at Manufacturers Junction, at Twenty-sixth and Cicero, which was the freight house used by Mudge & Co., was about fourteen blocks from its plant, and at certain times during the day truck drivers sent there with freight lost much time because of the congested condition, having to wait their time to be served.

J. W. Harmon, an electrical contractor, located a little more than a mile from the proposed freight house, who also used the freight house at Manufacturers Junction, thought that the proposed freight house would be of service to him in shipping and receiving freight because of the time lost at Manufacturers Junction because of congested conditions there. He understood that the proposed freight house was to be a universal station for freight in less than car-load lots.

R. E. Mansfield, a roofing and sheet-metal contractor, whose plant was a mile from the proposed freight house, testified that it would be convenient to him as a station for freight in less than car-load lots because the station which he used at Manufacturers Junction was overcrowded at times; that there is already a public team-track for car-load shipments at Sixteenth street and Forty-eighth avenue.

Carl O. Nerad, secretary of the Dearborn Truck Company, located in the ten-acre tract and engaged in the production of taxicabs to the extent of thirty-five or thirty-six car-loads a day, testified that if the public freight station should be located as proposed it would be within 200 feet of their plant and would be very convenient for their use.

The only possible public use for this proposed freight house suggested by the evidence for the railroad company was for what is known as a "universal" station, to receive and distribute freight in less than car-load lots.

On the part of the appellant, Edward J. Noonan, who was a consulting engineer, specializing in railroad terminal matters, of twenty-five years' experience in engineering of that kind and familiar with transportation and freight conditions in the Chicago district, who was the engineer for and a member of the Chicago Railway Terminal Commission, testified that he had in his possession detailed maps and plans of all the railroads within the Chicago terminal district, which included the town of Cicero and territory west of Cicero, and that he was familiar with the railroad situation, particularly as to the handling of less than car-load and team-track freight. He prepared a map of the territory extending three miles north and south from West Madison street on the north to Thirty-first street on the south and from Central avenue on the west to Crawford avenue on the east. The ten-acre tract in question was about in the center of this district. He explained in detail, in connection with the map, the existing railroad facilities in the district, pointing out the railroads, railroad

yards, the public team-tracks and public freight houses in the district, and testified that in his opinion the district was unusually well provided with railroad facilities, public team-tracks and public freight house facilities. There are team-tracks on the Chicago and Great Western railroad fronting on Cicero avenue (which is the same as Forty-eighth avenue) just north of Twelfth street and about a quarter of a mile distant from the northwest corner of the ten-acre tract in question. There are team-tracks on the terminal company's railroad on Colorado avenue, about two blocks east of Cicero avenue, and at Sixteenth and Cicero avenue, which are about a quarter of a mile from the tract in question. There are team-tracks on the Belt railroad on Twelfth street, about two blocks east of Cicero avenue. There are also team-tracks on the Manufacturers Junction railroad at about Twenty-fifth street and Cicero avenue, and on the Chicago, Burlington and Quincy railroad at about Twenty-fifth street and Cicero avenue. On team-tracks are handled car-load freight, which is unloaded and transported by trucks to its destination and on which cars can be loaded by hauling freight from the firm's plant. The public freight houses for the receipt and delivery of less than car-load freight are the universal freight station of the Manufacturers Junction railroad at about Twenty-fifth street and South Cicero avenue, the freight station of the Elgin (or third rail) line, and the Chicago, Burlington and Quincy railroad station on its line at Twenty-sixth and Cicero avenue. The Manufacturers Junction station is about a mile and a quarter from the corner of Cicero avenue and West Fourteenth street,—the southwest corner of the ten-acre tract in question. Other universal (less than car-load) freight stations within a radius of three miles or three miles and a half from the corner of Cicero avenue and West Fourteenth street are: one operated by the Belt railroad on North avenue and about Forty-eighth avenue,

321–8

about three miles and a quarter from the corner of West
Fourteenth and Cicero avenue; another operated by the
terminal company at the Sears-Roebuck plant at about
St. Louis avenue, about two and a half miles from Four-
teenth and Cicero; one at Sixteenth street and Western
avenue operated by the Chicago Junction railroad, and one
at Twenty-sixth street and Western avenue operated by the
same railroad. In the opinion of the witness the territory
covered by the map was well supplied with facilities for
the receipt and delivery of less than car-load freight, and
he stated as the reason for his opinion that in this terri-
tory there are no places where less than car-load freight
would originate that would incur a haul longer than the
average haul which would be incurred anywhere in the city
of Chicago for freight to reach less than car-load stations.
In certain parts of the territory which are already served
with switch-tracks, shippers can, if their business justifies
them, have trap-car service, which is used where the deliv-
eries are sufficient to justify the loading of a car a day.
These trap-cars are moved by the railroads to the nearest
station, where the freight is assembled with other freight
and shipped out, and this is a very satisfactory method of
handling less than car-load freight where there is a sufficient
volume of it to justify the loading of a car that can be
handled by the railroad operating the switch-track to its
track where it is assembled for carrying to destination.
The other desirable and much-used facility is the universal
freight station, where freight can be received for deliv-
ery direct to any one or all of the railroads doing business
within the Chicago terminal district. Where the volume of
business can be gathered for that purpose that kind of a
station can be justified. It involves sufficient volume of
freight to make possible the loading within the Chicago
terminal district of at least one car to each railroad, which
would be about twenty to twenty-one cars a day. The Man-

ufacturers Junction station is such a station.   In the Chi-
cago terminal district there are twenty-one of these trunk
line railroads that are reached by the Manufacturers Junc-
tion railroad.   The plan of such a station consists, in the
first place, of a freight house and platforms adjacent to
those freight houses and railroad tracks sufficient to handle
at least twenty-one cars,—a car for each railroad.   When
freight is received on the freight house floor it is marked
by railroads and placed in the particular car designated for
that railroad.   There must be enough volume of freight to
justify the placing of those twenty-one cars.

Fred D. P. Snelling, who had been engaged in the gen-
eral real estate business for thirty-three years and was a
member of the railroad terminal committee of the Chicago
Real Estate Board, also testified in detail about railroad
team-track and public freight station facilities in the ter-
ritory, substantially corroborating the testimony of Noonan.
W. C. Ranson, who had been superintendent of the Manu-
facturers Junction railroad for eighteen years, also testi-
fied substantially as Noonan and Snelling in regard to
the method of operation of a universal freight station and
the requirements for the maintenance of an adequate ser-
vice and successful operation.   It was stipulated also that
A. L. Sanger, who was the service agent for the traffic
committee of the Chicago Association of Commerce, would
testify on the same subject as Noonan, Snelling and Ran-
son, setting forth his testimony to the same effect, and fur-
ther, that in his opinion if an attempt were made to locate
a universal (less than car-load) freight station on the ten-
acre tract in question it could not be operated for the rea-
son that the volume of business would not be such as to
permit of such operation.   It requires from eighty to one
hundred tons of less than car-load freight a day to permit
of such operation, and without this volume not only would
the operation of the universal station be unprofitable, but
the delays in service would render it utterly impracticable

to operate. He explained this statement more fully in this manner: A shipper in the Chicago district has the option of teaming his freight from his place of business to each of the trunk line freight houses or to take it to a universal station. When his freight is delivered to the freight house of the trunk line it is the common practice to load it in a car which leaves Chicago for its destination that day. Whenever he delivers his freight to a universal station he understands that twenty-four hours will elapse between the date of delivery at the universal station and the loading in the trunk line out-bound cars. Therefore it devolves on the universal station to deliver all freight received on any day to the trunk line on the following day, or in some exceptional cases, where the tonnage is light, on the second day following. If it is necessary for the universal station, on account of a light tonnage received, to deliver freight received to the trunk lines only once a week, then the whole object of the universal station has been killed, because reasonable speed is the most vital factor of reasonable service to the shipper.

The evidence in the record demonstrates the physical impossibility of the operation of a universal station in the freight house in question because it could not handle more than two cars at a time, and the establishment of a mere local station for freight of less than car-load lots would produce no business because other and better facilities are already available. It is manifest that there is no intention of operating a universal freight station or of any purpose in the construction of the road than that declared in the application to the commission of serving the Hruby ten-acre tract. There was no provision for sufficient capital, there was no provision for experienced railroad management, the circumstances all show that there is no expectation of engaging in the operation of a railroad for the use of the general public and that there was no use to be served except the connection of that tract with the terminal company's

railroad, and the motion of the appellant to dismiss the petition should have been sustained.

The judgment is reversed and the cause remanded to the superior court, with directions to dismiss the petition.

*Reversed and remanded, with directions.*