(No. 29503.—

THE PEOPLE *ex rel.* William J. Tuohy, State's Attorney, Appellant, *vs.* THE CITY OF CHICAGO *et al.,* Appellees.

*Opinion filed September 18, 1946.*

478

MURPHY, J., dissenting.

WILLIAM J. TUOHY, State's Attorney, (JACOB SHAM-BERG, GORDON B. NASH, and MEYER H. GOLDSTEIN, of counsel,) all of Chicago, for appellant.

BARNET HODES, Corporation Counsel, (JOSEPH F. GROSS-MAN, and J. HERZL SEGAL, of counsel,) all of Chicago, for appellees.

Mr. CHIEF JUSTICE GUNN delivered the opinion of the court:

The complaint in this cause was filed in the superior court of Cook county by the People on the relation of the State's Attorney of Cook county, under the Quo Warranto Act of 1937. (Ill. Rev. Stat. 1945, chap. 112, par. 9.) The city of Chicago, the mayor, the city clerk and the comptroller of the city of Chicago were named as defendants. After alleging the passage of an act entitled, "An Act to add Section 23-103.1 to the Revised Cities and Villages Act," and its approval on April 11, 1945, it was alleged that the city council of the city of Chicago, acting under the authority of said added section, on April 16, 1945, passed an ordinance entitled, "Ordinance authorizing

the issuance of $5,000,000.00 slum clearance bonds of the City of Chicago and providing for the levy of taxes for payment thereof." It was further alleged that said ordinance was approved by the mayor on April 16, 1945; that on April 18, 1945, the ordinance was published in a newspaper published in the city of Chicago. A copy of the ordinance was attached to the complaint as exhibit A. It was further alleged that the ordinance was submitted to a vote at a special election held in the city of Chicago on June 4, 1945; that at said election the ordinance was approved by a majority of the voters voting on the question. The complaint further alleged that the defendants, acting under the purported authority conferred upon them by said ordinance, were preparing to issue and sell the bonds as therein provided. It was then alleged that the city of Chicago and the other defendants were without power or authority to pass said ordinance or to issue the bonds authorized by said ordinance, for the reason that the act under which it was passed is invalid for the following reasons: (1) That said act is incomplete and incapable of execution and is, therefore, void. (2) That it violates section 13 of article II of the constitution, in that it attempts to empower municipalities to acquire private property and use and dispose of the same for other than public purposes. (3) That it violates section 9 of article IX of the constitution, in that it attempts to vest municipalities with authority to assess and collect taxes for other than municipal corporate purposes. (4) That it fails to express facts sufficient to constitute an emergency as required by section 13 of article IV of the constitution and, consequently, did not become effective until July 1, 1945, which was subsequent to the date the ordinance was passed and the election held for its approval.

The complaint concluded with appropriate averments that the acts of the defendants under said ordinance and under said act were without authority, and constituted an

unlawful usurpation of power and authority not conferred upon them by law. The prayer was that the defendants be ousted from the exercise of the assumed powers which were alleged to be unlawful.

The plaintiff having expressly set forth in the complaint the grounds for the attack on the defendants' claimed right, as provided in section 3 of the Quo Warranto Act of 1937, (Ill. Rev. Stat. 1945, chap. 112, par. 11,) the defendants filed a motion to strike the complaint and dismiss the cause of action. The grounds alleged in the motion were: (1) That the complaint shows on its face by what warrant the defendants exercise the powers and authority therein referred to; (2) That the complaint shows on its face the defendants lawfully have, use and enjoy the powers and authority referred to in the complaint; (3) That the statute and ordinance referred to in the complaint, under which the powers were exercised, are lawful and valid; (4) That the complaint fails to state a cause of action against the defendants, or any of them. Upon a hearing the motion to strike the complaint and dismiss the action was sustained. The complaint was stricken and the cause of action dismissed. The plaintiff has perfected a direct appeal to this court, the construction of certain provisions of the constitution and the validity of the statute and ordinance being involved.

The act is an amendment to the Cities and Villages Act by adding a section designated 23-103.1, (Laws of 1945, p. 484,) which reads, in part: "To acquire by purchase, condemnation or otherwise any improved or unimproved real property the acquisition of which is necessary or appropriate for the rehabilitation or redevelopment of any blighted or slum area; to remove or demolish sub-standard or other buildings and structures from the property so acquired; to hold or use any of such property for public uses; and to sell, lease or exchange such property as is not required for the public purposes of the municipality."

Provision is also made in the same section that the manner of sale, lease or exchange shall be the same as is provided in sections 59-1 to 59-3 of the Cities and Villages Act, except when the sale or lease is made to a public corporation or a public agency.

Inasmuch as the second objection, that the statute violates section 13 of article II of the constitution in that it attempts to empower a municipality to acquire private property and use and dispose of the same for other than public purposes, goes to the validity as well as the practical operation of the act, it will be considered first.

Before the right of eminent domain may be exercised, the law, beyond a doubt, requires that the use for which the land is taken shall be public as distinguished from a private use. (*Litchfield and Madison Railway Co.* v. *Alton and Southern Railroad*, 305 Ill. 388.) Under the constitution property cannot be condemned for a private use. While, from time to time, the courts have attempted to define public use, there is much disagreement as to its meaning. Courts all agree that the determination of whether a given use is a public use is a judicial function. (*Limits Industrial Railroad Co.* v. *American Spiral Pipe Works*, 321 Ill. 101; *Zurn* v. *City of Chicago*, 389 Ill. 114. Any attempt to grant the right to take private property for private use is void. *Town of Kingston* v. *Anderson*, 300 Ill. 577; *Litchfield and Madison Railway Co.* v. *Alton and Southern Railroad*, 305 Ill. 388.

However, when the question arises judicially, the use may be one where it is difficult to apply any given test. The purpose may be highly beneficial to the public as well as to private interests; and, on the other hand, the use put to land acquired by private interests by eminent domain may be highly beneficial to the public, without giving the latter any control over the property taken.

The problem is rendered more complex by development arising since the adoption of the constitution, such as needs

for acquiring property for social, medical or health purposes, as well as for the application of new inventions which may be adapted to public use. Uses for purposes not contemplated at the time may be, and frequently are, declared by the legislature to be public uses for which the power of eminent domain may be properly used.

The question of what constitutes a public use has been before this court on several occasions, when general principles were applied to special conditions. The language used in those decisions must be read in connection with the facts involved, and is authority only for what is decided on such facts. (*City of Geneseo* v. *Illinois Northern Utilities Co.*, 378 Ill. 506.

It has been held a number of times that the right of eminent domain cannot be exercised for the purpose of acquiring land for a private switch from an industry to the main line of a railroad. (*Chicago and Eastern Illinois Railroad Co.* v. *Wiltse*, 116 Ill. 449; *Sholl* v. *German Coal Co.* 118 Ill. 427; *Limits Industrial Railroad Co.* v. *American Spiral Pipe Works*, 321 Ill. 101.) In *Millett* v. *People*, 117 Ill. 294, a law requiring a mining company to provide a railway scales to weigh coal dug by its employees was held to violate this section of the constitution, because it was taking private property, *viz.*, the cost of the scales, without compensation. In *Chicago and Northwestern Railway Co.* v. *Galt*, 133 Ill. 657, we held that a railway company could not take land by eminent domain to make a street for its own convenience; nor can land be taken for opening a private road. *Town of Kingston* v. *Anderson*, 300 Ill. 577.

*Gaylord* v. *Sanitary District*, 204 Ill. 576, determined a law authorizing the condemnation of water rights to facilitate a milling enterprise operated by private persons violated the constitution. Innumerable instances occur, both in the statutes and in decisions, of the proper exercise of eminent domain for public purposes. In many of these

cases the use for which the land was taken was held public by the courts, and in others so declared by the legislature, such as canals, cemeteries, drainage, pleasure highways, hard roads, schools, libraries, toll bridges, housing corporations, and many others.

Recently, in *Zurn* v. *City of Chicago*, 389 Ill. 114, we held that a law authorizing a corporation to take private property for the purpose of elimination and redevelopment of slum and blight areas was for a public use, regardless of the use to which the property might afterwards be put.

In some of these cases the courts have attempted to define a public use. In *Gaylord* v. *Sanitary District of Chicago*, 204 Ill. 576, we said: "It is also the settled doctrine of this court that to constitute a public use, something more than a mere benefit to the public must flow from the contemplated improvement. The public must be to some extent entitled to use or enjoy the property, not as a mere favor or by permission of the owner, but by right." A more complete definition is found in *Cleveland, Cincinnati, Chicago and St. Louis Railway Co.* v. *Polecat Drainage District*, 213 Ill. 83, in which we said: "The power of eminent domain can only be exercised when the property to be taken is to be devoted to a public use. A public use means public usefulness, utility, advantage or benefit. It is not essential that the entire community or people of the State, or any political subdivision thereof, should be benefited or share in the use or enjoyment thereof. The use may be local or limited. It may be confined to a particular district and still be public. (10 Am. & Eng. Ency. of Law, —2nd. ed.—1063.) If local or limited, the use must be directly beneficial to a considerable number of the inhabitants of a section of the State, and the property to be taken must be controlled by law, for the advantage of that particular portion of the community to be benefited."

In *Bartee Tie Co.* v. *Jackson*, 281 Ill. 452, in discussing this question, we said that to constitute a public use the

use must concern the public as distinguished from an individual or a particular number of individuals. Public use requires that all persons must have an equal right to the use and that it must be in common upon the same terms, however few the number who avail themselves of it; that it shall be open to all people to the extent that its capacity may admit of such use. Such use cannot be confined to privileged persons and must be for all men or a class of men, and not for a special few.

In *Limits Industrial Railroad Co.* v. *American Spiral Pipe Works,* 321 Ill. 101, public use is defined thus: "The use that will justify the taking of private property by the power of eminent domain is the use by or for the government, the general public or some portion of it, and not the use by or for particular individuals or for the benefit of certain estates." Also, "the character of the business proposed to be done, and the manner of doing it, must be looked to in determining whether the use will be a public or a private one. If, from the nature of the business and the way in which it is to be conducted, it is clear no obligations will be assumed to the public, or liability incurred, other than such as pertain to all strictly private enterprises, it may safely be concluded the use is private and not public." (*Sholl* v. *German Coal Co.* 118 Ill. 427.) Other definitions will be found in *People ex rel. Scott* v. *Ricketts,* 248 Ill. 428; *State Public Utilities Com.* v. *Monarch Refrigerating Co.* 267 Ill. 528; *State Public Utilities Com. ex rel. Macon County Tel. Co.* v. *Bethany Mutual Telephone Ass'n,* 270 Ill. 183.

The use may be confined to a particular district and still be public. (*State Public Utilities Com.* v. *Bethany Mutual Telephone Ass'n,* 270 Ill. 183; *Cleveland, Cincinnati, Chicago and St. Louis Railway Co.* v. *Polecat Drainage District,* 213 Ill. 83; *State Public Utilities Com. ex rel. Noble Tel. Co.* v. *Noble Mutual Telephone Co.* 268 Ill. 411.) It is not pointed out how the act under considera-

tion authorizes the taking of land for a private use when the facts in the case are measured by the definitions pointed out above. Section 1 provides for the purchase, condemnation or acquisition of land for the following purposes: (1) rehabilitation or redevelopment of any blighted area; (2) to remove or demolish buildings or structures on the land so acquired; (3) to hold or use such property for public uses; (4) to sell, lease or exchange such of the property as is not required for the public purposes of the community.

The act also provides for the manner of sale of property, except that used for public purposes, by referring to sections 59-1 to 59-3 of the Cities and Villages Act, and also defines what constitutes a blighted or slum area and designates the minimum area to be considered as an area coming within the provisions of the act. These purposes appear to us to be public within the principles announced above, and to meet all of the requirements set out there: (1) it affects a community as distinguished from an individual; (2) the law controls the use to be made of the property, *viz.*, the elimination of a slum district, and other public uses; (3) the title so taken is not vested in a person or corporation as a private property to be used and controlled as private property; (4) the public reaps the benefit of public possession and use, and no one can exercise control except the municipality.

The power given by the act to sell, lease or exchange such property as is not required for public purposes of the municipality is said to make the purpose of acquiring the property private, because eventually the property might be devoted to a private use. This purpose however is only that which the city may exercise over the property after slum elimination has been accomplished. That purpose is the rehabilitation or development of a blighted or slum area. Both are defined in the statute, and when rehabilitation has been accomplished by the acquisition of the land

and the removal of the structures, and after holding and using it for some appropriate public purpose, if there is any surplus land left, which is not needed for any of these purposes, it may be sold, leased or exchanged as provided therein. This construction is consistent with the context and the purposes of the act, and does not authorize the taking of land for the sole and only purpose of sale, leasing, or exchange thereof.

The contention that the power to lease manifests a private purpose is not sound, because it is settled that a city may lease property it owns when it is empowered to do so by the statutes. (*People* v. *City of Chicago,* 349 Ill. 304; *Barsaloux* v. *City of Chicago,* 245 Ill. 598; *City of Springfield* v. *Inter-State Independent Telephone and Telegraph Co.* 279 Ill. 324.) And it does not make it a private purpose even though rentals are charged for the use of it. (*Carstens* v. *City of Wood River,* 344 Ill. 319.) If the city acquires property in fee, and the necessity for its use fails, we have held it may be sold. (*Sanitary District* v. *Manasse,* 380 Ill. 27.) Merely because the city might attempt to devote property so acquired to a private purpose does not destroy the act, as it may, by appropriate proceedings, be compelled to observe its obligation to the public. Certainly, the city cannot go into the real estate business under the guise of relieving slum conditions.

Attached to the motion to strike and dismiss was an exhibit containing the report of a special committee that had examined certain slum areas, and which disclosed unsanitary conditions, fire hazards, basement occupancy, and which showed the general undesirability of the district. The general mortality was six per cent more than the city average; infant mortality was eleven higher per thousand, or about twenty-five per cent; and juvenile delinquency eight per cent. The inference is clear that these ratios exist because of poor conditions, and that the purpose of

the statute is to improve the public welfare, health and morals, and reduce the loss of life and property by fire.

We are of the opinion that the acquiring of land for such use is a public and not a private one, for which the granting of the power of eminent domain is amply justified.

It is also claimed that the act is incomplete because it purports to grant authority to municipalities to acquire property the acquisition of which is necessary or appropriate, for the rehabilitation or redevelopment of the entire blighted or slum area, and does not give the power to municipalities to rehabilitate or redevelop such areas. What we have said heretofore in this opinion in part answers this contention. The statute does not require the municipality to rehabilitate or redevelop such area by the construction or erection of buildings or improvements. The provision of the act is to rehabilitate or redevelop blighted or slum areas.

The statute further provides that a blighted or slum area means one where the buildings, by reason of dilapidation, over-crowding, faulty arrangement or design, lack of ventilation, light or sanitation facilities, or any combination thereof, are a detriment to public safety, health or morals. It seems obvious to the court that the acquisition of the property and the removal of the buildings or structures from the property would have the effect of removing the condition which the statute proposed to eliminate.

Under the general law with respect to cities and villages, numerous enterprises involving the use of ground, and the exercise of the right of eminent domain are provided for. The city can acquire grounds for parks, playgrounds, recreation centers, hospitals, streets and public places, and for many other purposes. This statute is not complete in itself, but is a part of the Cities and Villages Act. As pointed out above, it is another general power

given cities and villages, within the general grant of section 23-1. At the same session of the General Assembly like powers were given cities by a new section. (Laws of 1945, p. 485.) The statute is therefore a part of the Cities and Villages Act, and its general provisions cover fully all the objections raised on this ground. The city is permitted to use the land so acquired for any such or similar purposes by the words "to hold or use any of such property for public purposes," and, when this is understood, together with the matters we have discussed above, it is obvious that the act is complete and capable of being executed by the proper authorities, and therefore is not unconstitutional for this reason.

The objection that the statute violates section 9 of article IX of the constitution in that it vests municipalities with authority to assess and collect taxes for other than municipal corporate purposes is wholly without merit. The statute in question declares as a matter of public policy that a slum area is detrimental to public safety, health or morals. The State through the General Assembly may declare what is the public policy on matters of health, morals and safety. When this has been declared, and authority given to a city to eliminate a slum area, it becomes a corporate purpose within the meaning of section 9 of article IX of the constitution, and the power of taxation, or the issuance of bonds, is authorized by an unbroken line of decisions, of which the following are but a few: *People ex rel. Pearsall* v. *Chicago, Milwaukee and St. Paul Railway Co.* 319 Ill. 415; *City of Metropolis* v. *Gibbons,* 334 Ill. 431; *Perkins* v. *Board of County Comrs.* 271 Ill. 449; *Wetherell* v. *Devine,* 116 Ill. 631; *Burr* v. *City of Carbondale,* 76 Ill. 455.

The final objection is that the statute fails to express facts sufficient to constitute an emergency as required by section 13 of article IV of the constitution to enable it to become effective before July 1, 1945. An emergency clause

in quite similar language was before this court in *People v. Chicago Transit Authority*, 392 Ill. 77, and was held to be sufficient. It is unnecessary to repeat here what we said in that case. After mature deliberation we held the emergency clause was sufficient.

In view of the foregoing it is our opinion the law in question is valid, and that the bonds issued in accordance with the ordinance, approved in the method provided therein, are valid obligations of the city. The superior court of Cook county properly sustained the motion to strike the information in the nature of a *quo warranto*, because both the statute and the ordinance adopted thereunder are valid and legal.

The judgment of the superior court of Cook county is therefore affirmed.

*Judgment affirmed.*

Mr. JUSTICE MURPHY, dissenting.