(No. 31540.—

WARREN G. POOLE *et al.*, Appellees, *vs.* THE CITY OF KANKAKEE *et al.*, Appellants.

*Opinion filed September 21, 1950.*

VICTOR N. CARDOSI, City Attorney, of Kankakee, for appellants.

GOWER, GRAY & GOWER, of Kankakee, for appellees.

Mr. JUSTICE DAILY delivered the opinion of the court:

April 25, 1949, the city of Kankakee passed an ordinance providing for the issue of $430,000 in "Motor Vehicle Parking System Revenue Bonds," for the stated purpose of acquiring eight certain tracts of real estate to be used for the operation of off-street vehicle parking lots in the business section of the city. Some of the tracts sought were vacant, while the use of others would entail the purchase and removal of structures. The action of the city was purportedly based on the power granted it by article 52.1 of the Revised Cities and Villages Act, (Ill. Rev. Stat. 1949, chap. 24, art. 52.1,) titled, "Special Powers—Parking Space for Motor Vehicles." We shall hereafter refer to this statute as the "Parking Act." On August 5, 1949, Warren G. Poole, the owner and operator of a private parking lot in the business district, Carl L. Wolf, a downtown business man, Fred W. Swannell, Sr., a property owner and taxpayer, and Harry H. Pippin, a motor vehicle operator in the city, filed a complaint in the circuit court of Kankakee County seeking to enjoin the city, its mayor and clerk, from proceeding under the ordinance. It was alleged that both the statute and ordinance are invalid for reasons later discussed in detail. Defendants filed an answer, the case was called for trial, and evidence was heard. The trial court then entered a decree which found the Parking Act to be constitutional, with the exception of section 8, (Ill. Rev. Stat. 1949, chap. 24, par. 52.1-8), which section authorizes municipalities acquiring parking facilities under

the act to lease them on a year-to-year basis, collect rentals and to make contracts for their operation and management. It was the opinion of the trial court that the foregoing provision allows a municipality to lend financial aid to private enterprise, and permits the surrender of the municipalities' police power. The decree further found the city ordinance to be invalid on the ground that it was not a reasonable exercise of the power granted by the Parking Act, first, because no necessity for the parking lots was shown to exist in Kankakee, and, second, because it allowed the income from existing parking meters to be pledged as security for the bonds issued to finance the acquisition of the new facilities. In conclusion the decree enjoined the city and its officers from proceeding under the ordinance. They have appealed directly to this court, the validity of both the statute and the ordinance being involved and the trial judge having certified that, in his opinion, the public interest requires a direct appeal. It is appellants' position that the Parking Act is constitutional in its entirety and that the ordinance is valid. Plaintiffs-appellees have filed a cross appeal urging that the Parking Act is completely unconstitutional.

Any decision as to the validity of the ordinance is, of course, encompassed in a determination of the constitutionality of the Parking Act. Some examination of the statute is therefore necessary. The act, which contains ten sections, (Ill. Rev. Stat. 1949, chap. 24, pars. 52.1-1 to 52.1-10, incl.,) was first adopted by the legislature in 1947 and amended in 1949. It is before us for the first time. Section 1 provides in part that a municipality may: "Acquire by purchase or otherwise, own, construct, equip, manage, control, erect, improve, extend, maintain and operate motor vehicle parking lot or lots, garage or garages, parking meters, and any other revenue producing facilities necessary or incidental to the regulation, control and parking of motor vehicles * * * as the corporate authorities

may from time to time find the necessity therefor exists, * * *" etc. The section continues that land may be acquired by various means, including eminent domain, and that its purchase may be accomplished by the issue and sale of bonds. Section 2 describes the bonds, the interest they may bear, the manner of sale, and provides that such bonds may be payable only from the proceeds of the operation of "any or all" of the city's parking facilities. Section 3 relates to the content and form of the ordinance to be adopted by the municipalities. Section 4 provides that whenever bonds are issued, it shall be the duty of the corporate authorities to establish fees for the use of the parking facilities, sufficient to defray the cost of operation and maintenance, and the payment of principal and interest on the bonds, such revenues to be set aside as a separate fund and to be used only as provided in section 5. In section 6 the remedies of the bondholders are set forth, while section 7 authorizes the municipalities to make reasonable rules regarding the use, management and control of the parking facilities. As previously indicated, section 8, which was held unconstitutional by the trial court, authorizes the lease of the facilities, on a yearly basis, to the highest bidder. Section 9, which has some bearing on the matter here presented, contains the limitation that proprietary activities other than the operation of parking facilities, are unauthorized. Section 10 is a provision relating solely to financing by municipalities with a population in excess of 500,000.

The basic concept of appellees' attack on the Parking Act is that it authorizes a taking of property for a private use, as distinguished from a public use, in violation of section 13 of article II of our constitution. Specifically it is urged that the use authorized is private, (1) because it benefits individuals rather than the community; (2) because it allows a community to go into business in direct competition with private citizens; (3) in that the power

to lease the parking facilities manifests a private purpose; and, (4) because cities so acquiring property might attempt to devote it to a private use. Further, on the assumption that the use is a private one, it is contended that the act violates the due-process clause of both the Federal and State constitutions because it allows the taking of a taxpayer's money for a private purpose. In the same vein it is urged that the Parking Act allows a municipal corporation to lend financial aid to a private undertaking in violation of section 20 of article IV of the Illinois constitution.

It is conceded that before the right of eminent domain may be exercised the law requires that the use for which land is taken shall be a public as distinguished from a private use. (*People ex rel. Tuohy* v. *City of Chicago,* 394 Ill. 477; *Litchfield and Madison Railway Co.* v. *Alton and Southern Railroad,* 305 Ill. 388.) Under the constitution, property cannot be condemned for a private purpose. The determination of what is for the public good and what are public purposes are questions decided in the first instance by the legislature, which is vested with broad discretion in its determination. (*Cremer* v. *Peoria Housing Authority,* 399 Ill. 579; *People* v. *Chicago Transit Authority,* 392 Ill. 77.) However, since the constitution of this State is not a grant of power to the General Assembly but a limitation on its power, all legislative power is vested in the General Assembly, subject to the restrictions contained in the constitution. The final determination of whether a use or purpose is within the limits of the legislative discretion is a judicial function, thus it is for the courts to decide whether a given use is a public use. (*Zurn* v. *City of Chicago,* 389 Ill. 114.) The case of *People ex rel. Tuohy* v. *City of Chicago,* 394 Ill. 477, (pp. 481 to 484,) contains an exhaustive discussion of the criteria which have been utilized by this court in determining and defining a public use. We find that the majority of the questions raised in this case were answered there. The

requirements for a law embracing the taking of land for a public purpose were there condensed as follows: (1) that it affect a community as distinguished from an individual; (2) that the law control the use to be made of the property; (3) that the title so taken be not invested in a person or corporation as a private property to be used and controlled as private property; and (4) that the public reap the benefit of public possession and use, and that no one exercise control except the municipality. Almost to the same effect is the definition found in *Cleveland, Cincinnati, Chicago and St. Louis Railway Co.* v. *Polecat Drainage Dist,* 213 Ill. 83: "A public use means public usefulness, utility, advantage or benefit. It is not essential that the entire community or people of the State, or any political subdivision thereof, should be benefited or share in the use or enjoyment thereof. The use may be local or limited. It may be confined to a particular district and still be public. [Citation] If local or limited, the use must be directly beneficial to a considerable number of the inhabitants of a section of the State, and the property to be taken must be controlled by law, for the advantage of that particular portion of the community to be benefited." Measured by the above decisions, it is difficult to see that the Park Act manifestly authorizes the taking of land for a private purpose.

In examining the given use before us, *viz.,* the taking of land for the operation of off-street parking facilities, we find no express declaration in the Parking Act of the policy or purpose which fostered the legislation. While not binding on the court, such declarations are usually presumed to be right. We are fully cognizant that the regulation and control which a municipality may exercise over its streets and the vehicles which use them has been the subject of much legislation and of many decisions of this court. It can no longer be doubted that the regulation of streets and traffic is in the interest of public health, safety,

welfare, convenience and necessity, and thus for a public purpose. Undoubtedly the stopping or parking of vehicles along the street is a legitimate use of the street, but it is a use which is subject to legislative control. In *City of Bloomington* v. *Wirrick*, 381 Ill. 347, it was held that the appropriation of a part of the street on which parking meters were placed was a public use because it was incidental to the regulation of traffic on the streets. Likewise, it seems unquestioned that cities have authority to condemn property adjacent to an existing street for the purpose of widening it so as to accommodate the parking of vehicles and to facilitate the flow of traffic as well. Certainly, the acquisition of property for off-street parking would likewise be a public purpose and a less costly means of attaining the results sought.

We are aware of the fact that the modern economy and way of life are closely geared to the automobile, which fact has to be kept in mind in many aspects of community planning. A large proportion of urban dwellers today get from one place to another by automobile or other conveyances which use the city streets. Each passing year reveals a continued increase both in the number of urban dwellers and in the number of automobiles on our streets and roads. The result has been to create a problem of national significance, for in many instances the outmoded business streets of cities suffer from a traffic congestion which has strangulated movement and business, directly affected the safety of those who use and cross them, and affected the value and protection of adjacent properties. Ambulance, fire and police vehicles have difficulty reaching the scene of an emergency, while the toll of pedestrians killed on busy city streets seems to increase with each day's news. The economic value of time lost to business because of congested streets can only be surmised. Further, the economic effect of traffic strangulation has been reflected in slumping values of business real estate and a proportionate decline in local

tax income. As we view it, there is involved the safety and well-being of all the residents of a community so affected. To provide for off-street parking facilities is certainly a step to meet the public need. We are of the opinion that the Parking Act embraces the taking of land for a public use.

Appellees' objections which go to the operation of the act do little to alter that conclusion. The argument that the use is private because it enables a municipal corporation to enter into business in direct competition with individuals who are now operating parking lots cannot be sustained. A similar contention was made and rejected in *People ex rel. Curren* v. *Wood,* 391 Ill. 237, with regard to municipally owned airports. We said there: "The power to operate an airport is vested in the airport authority on the theory that such operation is necessary for public safety in aviation. * * * The fact that private airports may and do exist does not prevent operation and supervision of a public airport, any more than the ownership and operation of a private road, prevents operation, supervision and control of the public highways of the State." The foregoing language is adequate to meet the contention made here. Appellees agree that it is probably proper for municipal corporations to indulge in businesses which involve airports, utility monopolies, and the like, but asks that this court limit such corporations to activities "absolutely necessary for public good" as compared with those which are "desirable, but not so necessary." A plea for such a delineation would more aptly be directed to the legislature than to the judiciary, for, as previously stated, we are concerned only with the power of the legislature to enact the law, not the policy of the exercise of the power.

The contention that the authority given the municipality to lease the parking facilities imputes a private purpose to the act is also without merit. It has frequently been held that a city may lease property it owns when it is em-

powered to do so by the statutes. (*People ex rel. Tuohy* v. *City of Chicago*, 394 Ill. 477; *People* v. *City of Chicago*, 349 Ill. 304; *Barsaloux* v. *City of Chicago*, 245 Ill. 598.) Powers to contract for the use, and to fix fees and rentals, are not inconsistent with the public character of municipally owned lands. (*People ex rel. Curren* v. *Wood.* 391 Ill. 237.) Nor would the fact that the lessee might gain some private benefit from his operation of a parking facility alter the public nature of the act. All such benefits are merely incidental to the public purpose of the statute and do not constitute exclusive benefits for a privileged few. *Cremer* v. *Peoria Housing Authority*, 399 Ill. 579; *People ex rel. Greening* v. *Green*, 382 Ill. 577.

As regards the nature of the act, appellees' last assertion is that the public purpose is destroyed by the provisions which permit a municipality, once owning land, to use it for any type of private business it may choose. Appellees do not point out the language which is susceptible of such interpretation nor do we find that it exists. Section 9 specifically states that the act "shall not be construed as authorizing any municipality to engage in any proprietary activity at or with any such parking facilities other than the parking of motor vehicles." We find no merit to the contention made. Speculation that a city might attempt to devote the land acquired to a private purpose could not render the act invalid but would be ground for future judicial relief should the need arise.

Appellees next urge that the act violates the due process clause of both the State and Federal constitutions in that it allows the use of taxpayers' money for a private purpose. In view of our finding that the purposes and functions of the Parking Act are public rather than private, this contention is untenable. It should be noted too that the act provides for no tax or license, but rather only for a reasonable fee for the use of the facility,

It is also argued, and the trial court held, that section 8 of the act violates section 20 of article IV of the constitution, because leasing would permit the grant of aid to private enterprise, it being the appropriation of public funds for benefit of a private person, and would constitute a surrender of the city's police power. We have previously pointed out that leases permitted by an act do not detract from the public use or purpose of lands acquired by a municipal corporation, and that under the Parking Act the lease permitted is for a public use, making any profit to the lessee an incident to that use. It has been frequently held that section 20 of article IV does not prohibit appropriation of public funds to private corporations or individuals where the money is to be spent for a public purpose. (*Cremer* v. *Peoria Housing Authority*, 399 Ill. 579; *People ex rel. McDavid* v. *Barrett*, 370 Ill. 478 ) On the basis of these decisions we do not find that section 8 authorizes a grant of aid to a private enterprise. Neither can it be said that leasing constitutes a bargaining away or surrender of police powers to a lessee, for such a lease would bind and limit a lessee only to the performance of the public purpose as authorized and limited by the Parking Act. (*Krause* v. *Peoria Housing Authority*, 370 Ill. 356.) Should the contract of the city or the actions of lessee exceed those bounds, appellees are not without means of adequate and speedy relief.

The second phase of this appeal involves the validity of the ordinance passed by the city of Kankakee, and a determination of whether the city has exceeded the powers granted by the Parking Act. It would serve no useful purpose to set forth the ordinance in detail and we shall discuss only those provisions over which controversy has arisen. It will be recalled that the trial court held the ordinance invalid (1) because, in his opinion, no necessity for the parking facilities was shown to exist, and, (2) because

the Parking Act granted no authority to pledge the income of parking meters already installed as security for the bonds to be issued for the payment of the off-street parking sites. In this court appellees advance additional grounds, which were raised by the pleadings, namely, that the ordinance provides for a relinquishing of the city's right of police power until all the bonds are paid, and that it is invalid as being revenue producing rather than regulatory.

The trial court's finding that no necessity was shown to exist for the taking of land for parking facilities may be answered simply by an unbroken line of decisions which hold that where the right to condemn exists, and the property is subject to the exercise of the right of eminent domain and is being condemned for a public use, and the right to condemn is not being abused, courts cannot deny the right to condemn on the ground that the exercise of the power is unnecessary or not expedient, as the determination of that question devolves upon the legislative branch of the government, and is a question which the judicial branch of the government cannot determine. (*Smith* v. *Chicago and Western Indiana Railroad Co.* 105 Ill. 511; *Chicago and Eastern Illinois Railroad Co.* v. *Wiltse,* 116 Ill. 449; *Illinois Central Railroad Co.* v. *City of Chicago,* 141 Ill. 586; *County of Mercer* v. *Wolff,* 237 Ill. 74; *Hunt Drainage Dist.* v. *Harness,* 317 Ill. 292; *Department of Public Works and Buildings* v. *McCaughey,* 332 Ill. 416; *Eckhoff* v. *Forest Preserve Dist.* 377 Ill. 208; *Zurn* v. *City of Chicago,* 389 Ill. 114.) In such cases courts may only rightfully determine whether a petitioner has the power to exercise the right of eminent domain, whether the property is subject to the right of eminent domain and is being taken for a public use, whether the power is being abused, as by the taking of an excessive amount of property, and other kindred questions which do not involve a determination of the necessity or the expediency of the taking of lands sought to be condemned. (*Hunt Drainage Dist* v.

*Harness,* 317 Ill. 292). In the instant case we find no claim that the city is abusing its power. The only evidence was the testimony and charts of one Reilly, a consulting engineer in city planning, whose firm had made a traffic and parking survey in Kankakee. His testimony that the city was short parking space, and that the shortage created hazards which would be partially eliminated by establishment of off-street parking facilities, is uncontradicted in the record. The validity of an ordinance which is within the power granted is presumed, and the burden of showing its invalidity rests upon the party attacking it. (*City of Chicago* v. *Waters,* 363 Ill. 125.) The finding that the ordinance was invalid because it was unnecessary was, in this case, beyond the scope of the trial court's inquiry.

Section 9 of the ordinance, which was specifically found to be invalid, provides, among other things, for the pledge and use of revenue from existing parking meters to retire the bonds issued for the purchase of the lots embraced by the ordinance. The evidence disclosed that the revenue from the present meters was approximately $55,000 a year, and that $6433.36 was still due on the payment for such meters. The trial court held that the use of income from existing facilities was not authorized by the Parking Act. Appellees have not argued the point on this particular ground. It is true that section 1(d) of the act, to which the court below seems to have directed its sole consideration, authorizes the acquisition of sites, buildings and facilities and the pledging of "the revenues thereof." In the light of further language of the act, we consider this to be merely a grant of power rather than a limitation. Section 2, which relates solely to bonds, provides that bonds issued by a municipality pursuant to the act shall "be payable solely and only from the revenues to be derived from the operation of any or *all* of its parking facilities and shall be secured by a pledge of the revenues of

any or *all* of its parking facilities." We note, too, that section 1(e) gives the municipality power to issue bonds or borrow money "for the purpose of acquiring, completing, erecting constructing, equipping, improving, extending, maintaining or operating any or *all* of its parking facilities, * * *." etc. It is of further interest that section 1(a) authorizes the ownership, operation and maintenance of "parking meters." So far as we can determine, this appears to be the first direct expression of the legislature on the subject, since this court upheld the use of parking meters in *City of Bloomington* v. *Wirrick*, 381 Ill. 347. Considering the Parking Act as a whole, it is apparent that the legislature had the entire parking system of a city under consideration and not just the separate facilities which would be acquired. To say that the parking system should be broken down into isolated parts for financing and disposal of revenue is inconsistent with the public purpose of the act, *i.e.*, the orderly control and regulation of traffic. The language employed indicates the legislature intended that, where necessary, a city could, within its discretion, pledge the revenues from "any or all" of its parking facilities for the purpose of maintaining, extending or improving the overall uniform parking system.

Relying on the cases of *City of Joliet* v. *Alexander*, 194 Ill. 457, and *Schnell* v. *City of Rock Island*, 232 Ill. 89, where it was held that the mortgage of existing property and income created a debt which put the cities there involved beyond their constitutional debt limit, appellees urge that the pledge of revenues from existing meters is invalid on the same general principle involved in the cited cases, because the city of Kankakee will be deprived of the use of such revenues for other purposes. Such argument ignores the modification of those cases contained in *Maffit* v. *City of Decatur*, 322 Ill. 82, *Ward* v. *City of Chicago*, 342 Ill. 167, and *Simpson* v. *City of Highwood*, 372 Ill. 212, where it is stated that where no property of a city is

pledged to secure payment of an indebtedness, it does not violate the constitutional debt limitation to pledge the revenues both from the facility being extended and from the extension. In the instant case no attempt is made to pledge or mortgage any city property, thus, if the principle has any application at all, under the rule of the last-cited cases, the pledge of income from existing facilities does not render the ordinance invalid.

Next to be considered is the contention that the city has, by section 13 of the ordinance, contracted away to the bondholders its right of police power until such bonds are paid. This assertion is based on the language of the section which says that "after the issuance of the bonds no changes, additions or alterations of any kind shall be made to this Ordinance in any manner except in accordance with the provisions of this Ordinance, or until such time as all of said bonds issued hereunder and the interest thereon shall be paid in full." Appellees construe this provision as leaving the city absolutely powerless to act in the case of future change or emergency. Taking other provisions of the ordinance into consideration, we cannot say that such a dire result would be reached. Section 10(d) provides that the city may change the location of parking meters whenever necessary for traffic regulation and control. Section 10(a) provides that the city may withdraw any existing off-street parking facility for the purpose of erecting multiple level parking structures. It is also provided, under section 10 b), that while the city will at all times establish and maintain reasonable fees, charge rates for the use of the facility, and provide for the collection, segregation and application of such revenues, it may in its discretion provide free off-street parking in an area not to exceed twenty-five per cent of the square footage of all the facilities of the city. Section 5 reserves the right to redeem the bonds before maturity, beginning November 1, 1955, by publication of notice of redemption. It is apparent that the city has

reserved unto itself a wide discretion in the matter of location, regulation and control, and that, while it has pledged itself to fix and collect reasonable fees and charges, it has not bound itself to fix any specific unalterable amount of fee or charge. In this respect the instant case may be distinguished from *City of Danville* v. *Danville Water Co.* 178 Ill. 299, upon which appellees rely, for in that case the city attempted to contract away its right to fix reasonable water rates by agreeing to a fixed fee for thirty years. *City of Chicago* v. *O'Connell,* 278 Ill. 591, also relied upon, is authority only for the proposition that a city and utility may not validly enter into a contract the effect of which is to prevent the exercise of police power by the State. We find no such attempt in this case. It was pointed out in *Krause* v. *Peoria Housing Authority,* 370 Ill. 356, that while a city has no authority to bargain away its governmental powers it may voluntarily contract within the authority granted it by the State. Insofar as we can determine, the ordinance here commits the city only to the performance directed by the Parking Act, and as such does not constitute a surrender of its police power.

The final contention of appellees, that the ordinance is revenue producing rather than regulatory, is based on section 9(e) which provides that all moneys remaining after setting up the necessary accounts for bond payments, repairs, etc., shall be credited to the suspense account and that the city may transfer one half the surplus for any year to the general purpose corporate fund, to be used only for the repair and maintenance of streets and the regulation and control of traffic on said streets. This the city is allowed to do by section 1(b) and section 5 of the Parking Act. Appellees' argument is made in the face of the fact that an ordinance fixing the rates for the use of the facility has not yet been adopted, giving no sound basis for knowing whether the fee charged will bear a reasonable relation to the burden that the ordinance and Parking

Act cast upon the city. Complaint is also made that the ordinance makes no provision for what will occur when the bonds issued have been retired, and appellees forsee that the city will be enriched far in excess of the amount necessary to cover the cost of regulation and maintenance of the parking facilities. Such contemplation could not, as we have said before, render the ordinance presently invalid. If such future events occur, the law provides ample remedy for the situation to be corrected either by the city council or by the courts on proper complaint.

For the reasons stated, we conclude that both the Parking Act and the city ordinance are not subject to the objection here raised, and are valid in their entirety. The judgment of the circuit court of Kankakee County is accordingly affirmed in part and reversed in part, and the cause is remanded, with directions to dissolve the injunction entered against appellants.

*Affirmed in part and reversed in part*
*and remanded, with directions.*