# Illinois Official Reports

## Appellate Court

<div style="border:1px solid black; padding:1em;">

### *BNSF Ry. Co. v. Grohne*, 2019 IL App (3d) 180063

</div>

| | |
|---|---|
| Appellate Court Caption | BNSF RAILWAY COMPANY, a Delaware Corporation, Plaintiff-Appellee and Cross-Appellant, v. DAVID F. GROHNE, as Trustee Under the David F. Grohne Revocable Trust, Dated February 14, 1996; NONRECORD CLAIMANTS; UNKNOWN OWNERS; and CHICAGO TITLE AND TRUST COMPANY, as Trustee Under Trust No. 8002346417, Dated April 25, 2006, Defendants (David F. Grohne and Chicago Title and Trust Company, Defendants-Appellants and Cross-Appellees). |
| District & No. | Third District<br>Docket No. 3-18-0063 |
| Filed | July 3, 2019 |
| Decision Under Review | Appeal from the Circuit Court of Will County, Nos. 14-ED-65, 14-ED-66, 14-ED-67; the Hon. Roger D. Rickmon, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | James A. Murphy, of Mahoney, Silverman & Cross, Ltd., of Joliet, and Ken D. Rechtoris, of Sheppard, Mullin, Richter & Hampton LLP, of Chicago, for appellants.<br><br>Thomas F. Geselbracht and Eric M. Roberts, of DLA Piper LLP (US), of Chicago, for appellee. |

Panel                PRESIDING JUSTICE SCHMIDT delivered the judgment of the court, with opinion.
Justice McDade concurred in the judgment and opinion.
Justice Wright concurred in part and dissented in part, with opinion.


## OPINION

¶ 1        Plaintiff-appellee and cross-appellant, BNSF Railway Company (BNSF), filed three eminent domain lawsuits for the condemnation of tracts of land owned in trust by defendants-appellants and cross-appellees, David F. Grohne and Chicago Title and Trust Company (collectively, Grohne). Plaintiff sought to build an intermodal railway facility along BNSF's main rail line in Will County, Illinois, using the condemned land. After the trial court's ruling on the pending traverse actions, the court held a jury trial for the valuation of Grohne's tracts of land for purposes of exercising eminent domain. The jury awarded Grohne compensation for all three takings.

¶ 2        Grohne appeals, claiming the trial court erred by (1) limiting his cross-examination of experts on a comparable land sale contract at the valuation hearing pertaining to Will County case No. 14-ED-65, (2) denying his traverse and motions to dismiss in Will County case Nos. 14-ED-66 and 14-ED-67, and (3) misinterpreting section 10-5-110 of the Eminent Domain Act (Act) (735 ILCS 30/10-5-110 (West 2014)) pertaining to Will County case No. 14-ED-67.

¶ 3        BNSF cross-appeals, raising the following issues regarding the compensation awards: (1) whether, absent a substantial and material change, the trial court erred in granting a new valuation date for the properties pertaining to Will County case Nos. 14-ED-66 and 14-ED-67 and (2) whether the final judgment orders should have been entered based upon the parties' stipulations of value as of October 20, 2014, rather than the jury's verdicts as of July 21, 2017.

¶ 4                              I. BACKGROUND
¶ 5        On October 20, 2014, BNSF filed three eminent domain lawsuits to condemn three separate, but closely located tracts of land in Will County case Nos. 14-ED-65, 14-ED-66, and 14-ED-67. The complaints in the first two cases named David F. Grohne, as trustee of the David F. Grohne Revocable Trust, as defendant. The third lawsuit, Will County case No. 14-ED-67, named David F. Grohne, as well as Chicago Title and Trust Company, as holder of a land trust with David F. Grohne named as the beneficiary, as defendants.

¶ 6        BNSF intended to build an intermodal facility along its main line near Interstate 55 and Lorenzo Road in Will County, Illinois.[1] The northernmost tract (Grohne North), the subject of case No. 14-ED-65, consists of 81.251 acres. BNSF sought 51.872 acres. The two tracts to the south, the subjects of case Nos. 14-ED-66 (Grohne South) and 14-ED-67 (CTT), consist of 73.118 and 72.717 acres, respectively. BNSF sought 11.733 and 59.316 acres of these tracts, respectively. The BNSF main line splits the Grohne tracts subject to taking in all three cases.

_____
[1]An intermodal facility is a BNSF location where goods are brought in and consolidated for distribution by trains or trucks into the surrounding areas. The facilities are comprised of a system of tracks, support facilities, parking areas, roads, and trailers and containers awaiting shipment, unloading, and distribution.

¶ 7     On September 25, 2014, the BNSF Board of Directors (Board), with unanimous consent, signed a resolution outlining the details and necessity of an intermodal facility. Specifically, the resolution stated the following:

> "[I]n order to alleviate congestion on the [BNSF main line], prevent blocking of the main line and facilitate the Company's ability to meet the current demands of its existing customers and the future demands of additional development in the area, the Company proposes to construct and operate a multimodal facility adjacent to the [BNSF main line]. The facility will operate as a freight terminal and intermodal facility and will start from a connection to the Chillicothe Subdivision just east of Lorenzo Road and extend that facility west to a second connection to the Chillicothe Subdivision at Murphy Road. The second connection at Murphy Road is required to provide access to the facility from both ends to facilitate safe and expeditious operation of the main line. The facility will consist of multiple tracks and related connections, paved parking for holding containers and trailers waiting for local delivery or for loading onto rail cars, cranes for handling the containers and trailers and support facilities. There will also be truck gate structures to facilitate entrance and exit of containers and trucks to and from the facility. Full build out of the facility will require between 300 and 450 acres ***."

The resolution also outlined in detail the property to be acquired, including 122.921 total acres from Grohne.

¶ 8     BNSF, in the complaints filed in these consolidated cases, restated the purpose it laid out in the Board's resolution. Further, the complaints stated, "[t]he multimodal facility, once constructed and open for operations, will be used for the benefit of all users of BNSF's railroad without discrimination."

¶ 9     On November 24, 2014, Grohne filed a traverse and motion to dismiss in each of BNSF's lawsuits. On April 6, 2015, the trial court consolidated the cases. Grohne subsequently withdrew the traverse with respect to Grohne North. Thus, the traverse hearing covered only the 71.049 acres comprising Grohne South and CTT.

¶ 10    With respect to Grohne South and CTT, Grohne argued BNSF sought to acquire his private property, in part, for the purpose of providing direct rail service to a private, neighboring industrial park, RidgePort Logistics Park (RidgePort). Specifically, Grohne maintained BNSF's conceptual plan for the intermodal facility included a private track, or spur track, designed to provide RidgePort and its attracted customers or tenants with direct access to the newly constructed southern switch on BNSF's main line.

¶ 11    In further support of the traverse, Grohne argued BNSF desired to acquire Grohne South for unstated or speculative future uses. BNSF did not specifically identify these uses in its conceptual plan. As such, Grohne claimed BNSF attempted to acquire "significantly more" than the amount of acreage necessary for the planned intermodal facility project.

¶ 12    On July 27, 2015, the trial court held a hearing on the traverse. James Ball, senior manager of real estate for BNSF, testified about the Board's plan for the construction of an intermodal facility. Ball was in charge of acquiring property for the benefit of BNSF. Ball discussed the purpose and nature of the operations of intermodal facilities in general. Ball also stated that in October 2014, BNSF made three separate offers for the acquisition of Grohne's 124 acres. Grohne rejected each offer.

¶ 13    John Hovland, director of marketing and facility development for BNSF, testified before the court. Hovland explained that his responsibilities included siting, developing, and maintaining intermodal and automotive facilities. Hovland was responsible for determining the specific land necessary to construct an intermodal facility. In this case, Hovland anticipated the ultimate size of the proposed intermodal facility would be within the standard size for constructing intermodal facilities, approximately 460 acres.

¶ 14    Hovland also described the operations and demand for the proposed intermodal facility. In particular, Hovland discussed how BNSF's four other intermodal facilities in the area were too small and had minimal expansion capabilities. The newly proposed intermodal facility would take three years to construct. BNSF needed the additional intermodal facility due to forecasted growth in the Chicago area over the next five years. Further, the proposed intermodal facility could include and/or require support tracks for trains entering and leaving the facility, support facilities, an administration building, repair facilities for instrumentalities and equipment, parking areas, an overpass, water retention/detention facilities, grade separations, emergency facilities, and relocated power lines.

¶ 15    Hovland clarified that the plans were conceptual and would be implemented in phases, rather than all at once. Since BNSF had not acquired the necessary tracts of land, final planning and permitting could not be completed. Completion of the plans required additional engineering, surveying, and geotechnical exploration. The Grohne South and CTT tracts would potentially become the site of lead outs for the intermodal tracks, parking areas, water retention/detention facilities, and a grade separation for nearby roads. BNSF would be unable to construct the proposed intermodal facility without Grohne South and CTT. In Hovland's view, the proposed intermodal facility would serve many customers, without discrimination.

¶ 16    Opposing counsel cross-examined Hovland about the proposed spur track directly linking RidgePort to the main line. Hovland averred that the spur track was necessary to provide rail service to the industries attracted by RidgePort and to distribute the products of RidgePort's customers or tenants. Hovland admitted the spur track was not necessary to the intermodal facility itself but was essential for the industrial track to be fully functional.

¶ 17    David Irving, a civil engineer and vice president for Trans Systems Corporation, directed the design of the proposed intermodal facility. Irving testified that the intermodal facility and spur track were separate projects. He also approximated the spur track would traverse four acres of Grohne South and CTT. BNSF intended the spur track to serve RidgePort's customers with direct access to ship their goods via railway.

¶ 18    Irving agreed that the plans for the intermodal facility were conceptual. However, plans for the intermodal facility were difficult to conceive without Grohne South, as the project required 8000 feet of clear track. Further, additional tracks, water retention/detention areas, and parking, among other things, could encumber both tracts. The proposed intermodal facility did not yet include concrete plans for about 50% to 70% of Grohne South.

¶ 19    James Gordon, director of economic development for BNSF's northern lines, testified that BNSF entered a separate letter agreement with RidgePort outlining the parties' roles in constructing and paying for a spur track. Gordon explained that BNSF was to take on the task of using commercially reasonable efforts to acquire the land necessary for the construction of the spur track to link RidgePort's customers directly to the main line. RidgePort had begun advertising the spur track to potential private customers or tenants.

¶ 20    BNSF planned to construct the spur track in phases. One phase would include going south and west across CTT and Grohne South to BNSF's southern switch. Gordon stated BNSF was constructing the first phase of the spur track, but nothing else was contemplated until the Grohne tracts were available. He agreed BNSF desired the spur track for the purpose of providing RidgePort with direct access to the main line. If private customers or tenants were attracted, as planned, RidgePort, 1200 to 1500 acres in total size, would comprise 300 acres of rail-serviced property. BNSF had devoted approximately $20 million to the spur track project at the time of the traverse hearing.

¶ 21    Gordon clarified that as RidgePort attracted more rail-serviced customers across 300 acres, the spur track would be necessary for BNSF to manage increased traffic from RidgePort on what is already one of the busiest rail lines in North America. In particular, the spur track would provide a way for trains to enter and exit the main line from both directions without causing impediments to or congestion of the main line. The proposed design was the most effective way for BNSF to ensure this purpose, while also expanding its local operations, utilizing the acquired property, and serving customers located across RidgePort.

¶ 22    In closing arguments, Grohne argued the takings, namely for the spur track, were for a private purpose and excessive. Grohne also pointed out that BNSF's current plan did not include stated current uses for significant portions of the takings but, rather, mere speculative future uses. BNSF responded that it would not be serving merely one customer, RidgePort, with the side or spur track but potentially 300 acres of future rail-serviced customers. As such, BNSF maintained its takings were for the public, necessary, and not excessive.

¶ 23    On July 31, 2015, the trial court denied Grohne's traverse and motions to dismiss. The trial court stated that after reviewing the pleadings, suggestions, and arguments of the parties, it found that BNSF's takings were for a necessary, not excessive, public purpose.

¶ 24    The court set the trial for August 22, 2016, less than two years from the date BNSF filed its complaint for condemnation. In July 2016, Grohne filed a motion to reset the valuation date for the parcels. The court denied his first motion; it reset the jury trial for May 12, 2017. In April 2017, Grohne filed a motion to reconsider the court's denial of his motion for a new valuation date. The court, again, denied Grohne's motion. Instead of proceeding to trial in May, the parties entered into various stipulations regarding, *inter alia*, the 2014 value of the parcels. On May 30, 2017, Grohne once again filed a motion for a new valuation date. This time, the trial court granted Grohne's motion to reset the valuation date. It set the new values as of July 21, 2017. The court indicated it set a new valuation date to minimize error. It did not reach the issue of a substantial and material change but did state, "I would probably have found *** that there would be a substantial, material change." The court set the date for trial.

¶ 25    On September 27, 2017, Grohne offered to settle with BNSF on CTT. Grohne's proposed settlement included a joint stipulation that CTT was worth $3.9 million as of July 21, 2017, provided BNSF agreed to use the July date as the date of valuation. Additionally, Grohne's offer was only good so long as he retained the ability to appeal the trial court's denial of his traverse motion. BNSF rejected the offer.

¶ 26    The parties filed a variety of motions *in limine*. For the purpose of this appeal, our focus is on BNSF's motion to bar the use of comparable sales from before October 2014. The court denied BNSF's motion.

¶ 27    On October 16, 2017, the trial commenced. At trial, each party called two appraisers. For BNSF, Joseph Thouvenell opined that the values of the tracts of land were as follows: (1) $3,371,680 for Grohne North, (2) $645,315 for Grohne South, and (3) $2,965,800 for CTT.

¶ 28    Prior to Thouvenell's cross-examination, BNSF argued that the trial court should limit Grohne's questioning on an unexercised option to buy additional land, contained within a comparable land sale contract for a property adjacent to the Grohne tracts and relied upon in valuing the Grohne tracts. Elion Partners, RidgePort's predecessor, owned the adjacent property. Elion sold it to Batory Foods. Grohne argued that the option showed how downward adjustments in value were calculated for tax increment finance benefits on the adjacent property.

¶ 29    The trial court barred discussion of the unexercised option provision, acknowledging that there were two parts to the comparable land sale contract for the adjacent property—an actual sale and an unexercised option. The court reasoned that questioning on the unexercised option was far more prejudicial than probative. The trial court found that Grohne could cross-examine BNSF's experts on their calculations for the actual sale but did not believe the jury could consider the value of an option that was, and might remain, unexercised.

¶ 30    Susan Enright, also for BNSF, opined that the values of the tracts of land were as follows: (1) $3.5 million for Grohne North and (2) $2.5 million for CTT. Enright did not give an opinion as to the value of Grohne South.

¶ 31    For Grohne, Michael MaRous opined that the values of the tracts of land were as follows: (1) $6,095,000, plus $225,000 in damages to the remainder for Grohne North, (2) $880,000 for Grohne South, and (3) $4,210,000 for CTT.

¶ 32    John Mundie, also for Grohne, opined that the values of the tracts of land were as follows: (1) $6,485,000, plus $100,000 in damages to the remainder for Grohne North, (2) $1,020,000 for Grohne South, and (3) $4.5 million for CTT. Grohne requested the jury award amounts consistent with the appraisals of MaRous.

¶ 33    On October 20, 2017, the jury awarded the following amounts for the Grohne takings: (1) $4,927,840, plus $100,000 in damages to the remainder for Grohne North, (2) $862,375.50 for Grohne South, and (3) $4,063,146 for CTT. On October 24, 2017, the trial court entered judgment orders consistent with the jury's awards.

¶ 34    Both BNSF and Grohne filed posttrial motions. The trial court denied all posttrial motions. Grohne filed a notice of appeal. BNSF cross-appealed.

¶ 35                                    II. ANALYSIS

¶ 36    Grohne raised the following three issues on appeal: (1) whether prohibiting cross-examination about a comparable land sale contract constituted an abuse of discretion with respect to Grohne North, (2) whether denying the traverse and motions to dismiss pertaining to Grohne South and CTT was against the manifest weight of the evidence, and (3) whether the trial court's interpretation of section 10-5-110 of the Act (735 ILCS 30/10-5-110 (West 2014)) was erroneous as a matter of law, pertaining to CTT.

¶ 37    BNSF's cross-appeal raised the following three issues: (1) whether, absent a substantial and material change, the trial court erred in granting a new valuation date for Grohne South and CTT and (2) whether the final judgment orders should have been entered based upon the

parties' stipulations of value for Grohne South and CTT as of October 20, 2014.

¶ 38                                    A. Grohne's Appeal
¶ 39                        1. *Will County Case No. 14-ED-65 (Grohne North)*
¶ 40        On appeal, the only issue Grohne raised with respect to Grohne North was whether the trial court abused its discretion by limiting the cross-examination of BNSF's expert witnesses during the valuation hearing. Grohne argued that the trial court's decision to limit questioning about an unexercised option in a comparable land sale contract prejudiced Grohne's right to just compensation for Grohne North.

¶ 41        Elion Partners, RidgePort's predecessor, owned property that was the subject of the comparable land sale contract. It planned to sell to Batory Foods. Pursuant to the land sale contract, the parties agreed that Batory Foods could execute an option to purchase additional land in the future as part of the agreement. Grohne maintained that prohibiting cross-examination about this unexercised option, and thereby on downward value adjustments used by the experts, prevented him from painting an accurate picture of the value for the adjacent tract. Namely, Grohne argued he was not allowed to produce evidence showing how BNSF's appraisal expert had adjusted the adjacent tract's $141,000-per-acre starting value to $62,880. In Grohne's view, this questioning would have necessarily caused the jury to consider downward adjustments, applicable to the adjacent property and award a higher amount per acre for Grohne North. Barring cross-examination, according to Grohne, misled the jury on how downward adjustments impacted the expert valuations submitted to the jury for consideration.

¶ 42        The scope of cross-examination rests within the sound discretion of the trial court and will not be disturbed absent an abuse of that discretion. *Leonardi v. Loyola University of Chicago*, 168 Ill. 2d 83, 102 (1995). The same is true for the admissibility of evidence showing comparable land sales. *Department of Public Works & Buildings v. First National Bank of Joliet*, 9 Ill. App. 3d 633, 636 (1973). The trial court abuses its discretion when its decision is arbitrary, fanciful, unreasonable, or where no reasonable person would take the adopted view. *Seymour v. Collins*, 2015 IL 118432, ¶ 41.

¶ 43        Purchase options are admissible in some condemnation cases where no recent sales of similar lands occurred in the vicinity. *City of Chicago v. Blanton*, 15 Ill. 2d 198, 201-02 (1958). However, the trial court may properly refuse to admit evidence of an option agreement if there is evidence of an actual real estate sale. *Id.* at 202.

¶ 44        Here, we acknowledge the land sale contract between Elion Partners and Batory Foods included an actual sale, as well as an option to purchase additional land in the future. In other words, the sale involved two parts to one sales agreement. This distinguishes the transaction from other cases where an option contract is the only evidence of a comparable land sale.

¶ 45        The trial court's decision to limit the scope of Grohne's cross-examination was not without a sound basis in existing case law. We cannot ignore existing precedent averring that option agreements, here an unexercised option, are generally inadmissible where there is evidence of an actual, comparable land sale. See *id.* at 201-02. We agree with the trial court that such evidence had the potential to confuse the jurors and was overwhelmingly more prejudicial than probative. The trial court's ruling was within its discretion.

¶ 46        2. *Will County Case Nos. 14-ED-66 (Grohne South) and 14-ED-67 (CTT)*

¶ 47    Grohne raised two issues with respect to Grohne South and CTT: (a) whether denying the traverse and motions to dismiss was against the manifest weight of the evidence and (b) whether the trial court's interpretation of section 10-5-110 of the Act was erroneous as a matter of law. 735 ILCS 30/10-5-110 (West 2014).

¶ 48                        a. Traverse and Motions to Dismiss

¶ 49    Grohne argued the trial court's denials of its traverse and motions to dismiss pertaining to Grohne South and CTT were against the manifest weight of the evidence. See *Department of Transportation ex rel. People v. Hunziker*, 342 Ill. App. 3d 588, 593-94 (2003). More particularly, Grohne maintained the takings of Grohne South and CTT, in part, were for private and unstated or speculative purposes that were not necessary to fulfill the needs of the public. BNSF contended that the trial court's denial of each traverse and motion to dismiss was supported by the evidence of record.

¶ 50                        i. General Legal Principles

¶ 51    A traverse is a method for a landowner, such as Grohne, to challenge an entity's authority to take property through the extraordinary power of eminent domain against the landowner's wishes. *Lake County Forest Preserve District v. First National Bank of Waukegan*, 154 Ill. App. 3d 45, 51 (1987). The appellate court reviews the denial of a traverse against the manifest weight of the evidence. *Enbridge Pipeline (Illinois), LLC v. Temple*, 2017 IL App (4th) 150346, ¶ 89. A finding of fact is against the manifest weight of the evidence where an opposite conclusion is clearly evident. *University of Illinois v. Industrial Comm'n*, 365 Ill. App. 3d 906, 910 (2006). If the record contains sufficient factual evidence to support the determination, we will not set it aside on appeal. *Beattie v. Industrial Comm'n*, 276 Ill. App. 3d 446, 450 (1995).

¶ 52    Section 18c-7501 of the Illinois Vehicle Code (Code) provides railroads with the statutory authority to exercise the extraordinary power of eminent domain under certain circumstances. 625 ILCS 5/18c-7501 (West 2014). The Code provides the power of eminent domain to any rail carrier that has been "unable to agree with the owner for the purchase of any real estate required for the purposes of [the rail carrier's] incorporation, or the transaction of [the rail carrier's] business, *** or any other lawful purpose connected with or necessary to the building, operating or running of such rail carrier." *Id.*

¶ 53    The Code works in conjunction with the Act. See 735 ILCS 30/5-5-5(c)(9) (West 2014). Specifically, pursuant to the statutory authority conferred by section 18c-7501 of the Code, section 5-5-5(c)(9) of the Act creates a rebuttable presumption that the acquisition of private property by a rail carrier's exercise of the eminent domain authority is (i) primarily for the benefit, use, or enjoyment of the public and (ii) necessary for a public purpose. *Id.*

¶ 54    In this case, both parties agree that the interface between the Code and the Act entitled BNSF to the rebuttable presumption that its decision to act, as embodied in the Board's 2014 resolution of necessity, was (i) primarily for the benefit, use, or enjoyment of the public and (ii) necessary for a public purpose. See *id.*; 625 ILCS 5/18c-7501 (West 2014).

¶ 55    However, the parties disagreed on Grohne's burden of proof to overcome the statutory presumption in favor of the railroad. Grohne argued a landowner may overcome the statutory presumption by showing merely "some evidence." BNSF claimed a landowner must introduce

not "some evidence" but "clear and convincing evidence" to overcome this statutory presumption.

¶ 56   In a similar case of condemnation, the reviewing court held that "a party challenging a strong presumption must present clear and convincing evidence to rebut the presumption." *Enbridge Energy (Illinois), L.L.C. v. Kuerth*, 2016 IL App (4th) 150519, ¶ 134. This standard requires proof greater than a preponderance of the evidence but less than proof beyond a reasonable doubt. *Altenheim German Home v. Bank of America, N.A.*, 376 Ill. App. 3d 26, 37 (2007).

¶ 57   Thus, at the traverse hearing, Grohne was required to show by clear and convincing evidence that BNSF's exercise of eminent domain authority was not (i) primarily for the benefit, use, or enjoyment of the public, or (ii) necessary for a public purpose. *Id.*

¶ 58                    ii. Primary Public Benefit, Use, or Enjoyment.

¶ 59   We first turn to *Enbridge Energy (Illinois), L.L.C. v. Kuerth*, 2018 IL App (4th) 150519-B, ¶ 53, which was decided in the context of section 5-5-5(c) of the Act. In that case, the Fourth District Appellate Court recognized there is no bright-line test for whether the public is the primary beneficiary of a taking. *Id.* ¶ 54. Instead, the court observed there are two considerations relevant to that question. *Id.* These considerations include (1) the actual motives behind the taking and (2) whether the taking was an independent and legitimate decision to further a planned public use. *Id.* This position, adopted in the context of section 5-5-5(c), is consistent with past decisions recognizing that the main criterion of a public use is a benefit to the general public, even when the condemnation would simultaneously be highly beneficial to other private interests. See *Department of Public Works & Buildings v. Farina*, 29 Ill. 2d 474, 480 (1963); *Limits Industrial R.R. Co. v. American Spiral Pipe Works*, 321 Ill. 101, 107-08 (1926).

¶ 60   BNSF executives testified that the proposed intermodal facility was necessary to service an ever-growing market of customers shipping goods across North America. Hovland averred the spur track was necessary to provide rail service to the industries attracted by RidgePort while managing the increased traffic. The facility would serve many customers without discrimination. Irving estimated that if private customers or tenants were attracted as planned, RidgePort would comprise 300 acres of rail-serviced property. Gordon explained the spur track would provide a way for trains to enter and exit the main line from both directions without causing impediments to or congestion of the main line. He averred this plan was the most effective way for BNSF to ensure the intermodal facility served its purpose to expand local operations, fully utilize the acquired property, and efficiently serve RidgePort customers looking to ship consumer goods across the nation.

¶ 61   Grohne elicited competing testimony from these same executives. Hovland admitted the side or spur track was not necessary to the intermodal facility itself but was essential for the industrial track to be fully functional. He said the plans were mostly conceptual as of the date of the traverse hearing. BNSF could only take so many steps before acquiring the necessary Grohne tracks. Irving considered the spur track to be its own project. BNSF did not have specific plans for some of the land.

¶ 62   By enacting section 5-5-5(c), the legislature included language recognizing the acquisition of private property by eminent domain should be "primarily" for the public benefit, use, or enjoyment. See 735 ILCS 30/5-5-5(c) (West 2014). In this respect, the Act is consistent with

prior case law on the nature of a public benefit, use, or enjoyment. Consequently, we hold there is no express legislative requirement that the property acquired by eminent domain be exclusively for the benefit, use, or enjoyment of the public. Thus, despite 4 of 71.049 acres being taken from Grohne for the spur track, we conclude Grohne could not overcome BNSF's evidence that the takings of Grohne South and CTT were "primarily" for the public benefit, use, or enjoyment of an intermodal facility. Common sense dictates that the spur track would benefit not only the industries in the industrial park but also their many customers throughout the country. The trial court's finding in this regard was not against the manifest weight of the evidence.

¶ 63                                  iii. Necessary for a Public Purpose

¶ 64        Next, we turn to whether Grohne provided clear and convincing evidence that the taking of Grohne South and CTT was not necessary for a public purpose or excessive.

¶ 65        Initially, we address Grohne's argument pursuant to *People ex rel. Director of Finance v. Young Women's Christian Ass'n of Springfield*, 86 Ill. 2d 219, 239 (1981) (*YWCA of Springfield*), that the takings here are "grossly excessive" due to significant portions having no stated, present public purpose. In our view, *YWCA of Springfield* is unpersuasive, as this is not a case where "over half of the total area sought [is] being taken without *any* showing of need, present *or future*." (Emphases added.) *Id.* Rather, BNSF was able to account for needs that could be "fairly anticipated in the future." (Internal quotation marks omitted.) *Id.*

¶ 66        In this case, the testimony at the traverse hearing indicated BNSF sought to acquire an amount of land that was within the standard size for intermodal facilities and the specific uses and encumbrances of Grohne South and CTT that would make the intermodal facility operational. In particular, the testimony of Hovland and Irving indicated BNSF could fairly anticipate using Grohne South and CTT for, among other things, support tracks, parking areas, water retention/detention facilities, and a grade separation of the intermodal facility from nearby Murphy and Lorenzo Roads. As a result, Grohne's argument under *YWCA of Springfield* is unavailing.

¶ 67        In the past, our supreme court stated, " 'where the legislature has delegated to a corporation the authority to exercise the power of eminent domain, the corporation has also the authority to decide on the necessity for exercising the right, and its decision will be conclusive in the absence of a clear abuse of the power granted.' " *City of Chicago v. Midland Smelting Co.*, 385 Ill. App. 3d 945, 965 (2008) (quoting *City of Chicago v. Vaccarro*, 408 Ill. 587, 597 (1951)); see also *Goldman v. Moore*, 35 Ill. 2d 450, 453 (1966).

¶ 68        Grohne contends BNSF's decision to acquire and then use a portion of his land for private profit constitutes such a "clear abuse" of power. In order to resolve this issue, we turn to the language of the resolution passed by the Board in September 2014. The Board's resolution states the proposed takings are necessary in order "to provid*e access to the facility* from both ends to facilitate safe and expeditious operation of the main line." (Emphasis added.) Similarly, the complaints filed by BNSF one month later consistently allege that the land to be taken by the railroad was "needed for the construction of a multimodal facility" that would consist of "multiple tracks and related connections, to allow trains to be taken off the main line, and broken down, for further handling by Plaintiff."

¶ 69        Necessary, as used in a statute, should mean "expedient, reasonably convenient or useful to the public, and cannot be limited to an absolute physical necessity." (Internal quotation

- 10 -

marks omitted.) *Department of Public Works & Buildings v. Lewis*, 411 Ill. 242, 245-46 (1952). The proper judicial inquiry into necessity is whether "the purpose for which the land is sought is one of public convenience, and the acquisition, reasonable in scope, is an expedient means of accomplishing the purpose." *Department of Transportation v. Keller*, 127 Ill. App. 3d 976, 980 (1984).

¶ 70    As discussed above, great deference is afforded to the legislature's grant of the eminent domain authority. In this case, the spur track allows RidgePort's many customers access to a rail line without interfering with the normal flow of BNSF's traffic. The big picture consequence of the spur track is that more businesses will be able to ship more goods across North America with limited stops and congestion at this location. The spur track is "expedient, reasonably convenient, [and] useful to the public" in that it serves a purpose of "public convenience, and the acquisition, reasonable in scope, is an expedient means of accomplishing the purpose." (Internal quotation marks omitted.) *Id.* More businesses shipping more goods is a net benefit to the flow of commerce and those engaged in its practices. Grohne did not present clear and convincing evidence to rebut the presumption that BNSF's takings were necessary for a public purpose or not excessive. Thus the trial court's denial of Grohne's traverse and motions to dismiss was not against the manifest weight of the evidence.

¶ 71                                    b. Attorney Fees

¶ 72    Grohne argued the trial court erred in its interpretation of section 10-5-110(b) of the Act (735 ILCS 30/10-5-110(b) (West 2014)). This misinterpretation prevented Grohne from recovering his attorney fees with regard to CTT. The statute, titled "[o]ffers of settlement by defendant; attorney's fees and litigation expenses" states:

> "At any time between (i) the close of discovery in accordance with Supreme Court Rule 218(c), as now or hereafter amended, or another date set by the court or agreed to by the parties, and (ii) 14 days before the commencement of trial to determine final just compensation, any defendant may serve upon the plaintiff a written offer setting forth the amount of compensation that the defendant will accept for the taking of that defendant's interest in the property. If the defendant does not make such an offer, the defendant shall not be entitled to the attorney's fees ***." *Id.*

Grohne made an offer to BNSF for the CTT property. He argues he thereby qualified under the statute; the trial court should have awarded him the properly attributed attorney fees.

¶ 73    Our interpretation of a fee-shifting statute is an exercise of statutory construction. *Forest Preserve District v. Continental Community Bank & Trust Co.*, 2017 IL App (1st) 170680, ¶ 31. We give the language of the statute its plain and ordinary meaning. *Southern Illinoisan v. Department of Public Health*, 218 Ill. 2d 390, 415 (2006). We strive to give each word a meaning; words should not be rendered superfluous. *Williams v. Staples*, 208 Ill. 2d 480, 487 (2004). The court may consider the purpose of the law in construing a statute. *Id.* Whether the court has the authority to grant attorney fees under a particular statute is a question of law we review *de novo*. *Continental Community Bank & Trust Co.*, 2017 IL App (1st) 170680, ¶ 32. We review the ultimate decision of whether to award attorney fees for an abuse of discretion. *Id.*

¶ 74    The statute on which Grohne relied required him to make an offer of compensation that he would accept for "the taking of [his] *interest* in the property." (Emphasis added.) 735 ILCS 30/10-5-110(b) (West 2014). Grohne, as the owner, had an ownership interest in CTT. The

- 11 -

Property Tax Code defines ownership interest as "any title or other interest in property." 35 ILCS 200/21-285(1) (West 2014). Grohne, in his proposed settlement to BNSF, refused to settle if he could not appeal the trial court's denial of his traverse. In order to have standing to challenge the trial court's denial, Grohne would have to retain an interest in CTT. He cannot be said to have offered to relinquish his interest in property if he simultaneously wanted to maintain the right to proceed with further legal action.

¶ 75    Grohne stated in his brief that he "wanted to preserve his ability to contest [BNSF's] right to take the property." A plain reading of the statute indicates a defendant can recoup his attorney fees only if he (1) made an offer and (2) was willing to relinquish his interest in the property. Grohne was not willing to cede his interest in CTT to BNSF. Grohne did not qualify under this statute. The trial court did not err in its interpretation of the statute. The court did not abuse its discretion by failing to award Grohne his attorney fees attributable to CTT.

¶ 76                          B. BNSF Cross-Appeal
¶ 77          1. *Whether the Trial Court Erred in Granting a New Valuation Date*
¶ 78    BNSF cross-appeals, contending the land's value did not substantially and materially change. Absent such a change, the trial court erred in granting a new valuation date. We review a lower court's decision to grant a new valuation date for an abuse of discretion. *In re D.T.*, 212 Ill. 2d 347, 356 (2004) (holding the abuse of discretion standard applies to a trial judge's decision regarding the progress of a trial). The question here is not whether the reviewing court agrees with the trial court's action but whether the trial court "acted unreasonably and ignored recognized principles of law, which resulted in substantial prejudice." *Petryshyn v. Slotky*, 387 Ill. App. 3d 1112, 1116 (2008). We can affirm for any reason apparent in the record. *City of Champaign v. Torres*, 214 Ill. 2d 234, 241 (2005).

¶ 79    *Forest Preserve District v. First National Bank of Franklin Park*, 2011 IL 110759 (*Forest Preserve II*), is instructive here. In *Forest Preserve II*, the Illinois Supreme Court adopted *Kirby Forest Industries, Inc. v. United States*, 467 U.S. 1 (1984), holding that "a taking in Illinois for the purposes of applying *Kirby* occurs on the date that the government (1) deposits the amount of compensation that has been ascertained and awarded, *and (2)* acquires title and the right to possess the property." (Emphasis in original.) *Forest Preserve II*, 2011 IL 110759, ¶ 40.

¶ 80    In 1999, the preserve filed a condemnation action to acquire a public golf course. *Id.* ¶ 5. The landowners filed a traverse and motion to dismiss the condemnation action. *Id.* ¶ 8. The case did not proceed to trial until 2007. *Id.* ¶ 12. The Act, on which BNSF relies in the case *sub judice*, provided the valuation of the condemned property is to be "determined as of the date of filing the complaint to condemn." 735 ILCS 30/10-5-60 (West 2014). However, the legislature had recently amended the Act to allow a circuit judge to revise a valuation date in the interests of equity and justice. See *id.* ("[I]f the trial commences more than 2 years after the date of filing the complaint to condemn, the court may, in the interest of justice and equity, declare a valuation date no sooner than the date of filing the complaint to condemn and no later than the date of commencement of the trial ***.").

¶ 81    The jury valued the property based on the 1999 valuation. *Forest Preserve II*, 2011 IL 110759, ¶ 13. The landowners complained that an increase in value had occurred by 2007. *Id.* The landowners obtained no relief in the trial court and appealed. *Id.* ¶¶ 13-14. The Illinois Supreme Court applied *Kirby* to the facts of the case. *Id.* ¶ 39. It agreed with the appellate court

that the jury's verdict should be vacated and the cause should be remanded to the circuit court for a determination as to whether the jury awards provided substantially less than the market value of the property at the time of the taking. *Id.* ¶ 70. Our supreme court did not make a finding that the value of the land had substantially and materially increased because, as the appellate court noted, "the plaintiff has not had the opportunity to proffer contrary evidence of the [p]roperty's value as of the time of trial, and the trial court has not weighed any such evidence." *Forest Preserve District v. First National Bank of Franklin Park*, 401 Ill. App. 3d 966, 991 (2010) (*Forest Preserve I*). The appellate court noted, "defendants [are] entitled to receive just compensation for the [p]roperty, *i.e.*, its fair market value at the time of the taking." *Id.* at 990.

¶ 82    The court, in the case *sub judice*, reset the valuation date for the takings. The procedural history here is distinct from *Forest Preserve I* and *II*, where the trial court did not hear arguments from both sides as to a change in value. Here, the court had the opportunity to hear from both sides and consider the arguments and evidence before deciding whether the change in value warranted a new valuation date. This difference is important as it is the exact reason that the reviewing courts in *Forest Preserve I* and *II* could not conclude whether the defendants received just compensation.

¶ 83    BNSF argues the trial court was inconsistent in its findings and therefore abused its discretion. BNSF cites no case law to support this position. The court denied BNSF's motion *in limine* to bar the introduction of four sales that occurred prior to October 2014. Grohne, as the proponent of the sale, was required to show that no substantial change in conditions or fluctuations in value occurred between the comparable sale and the court's valuation date. *Department of Transportation v. Prombo*, 63 Ill. App. 3d 407, 412-13 (1978). BNSF contends implicit in the court's denial of its motion is a finding that there no was no substantial change between the comparable sales and the valuation date. This is at odds with the court's earlier ruling granting a new valuation date. However, BNSF does not appeal the trial court's denial of its motion *in limine*.

¶ 84    We afford considerable deference to the trial court's decision to set a new valuation date. We may also affirm for any reason apparent on the record. The value of Grohne North increased by 39% and the values of Grohne South and CTT increased by 25% each. Grohne was entitled to just compensation valued on the day of the taking. The properties' values increased markedly between the date BNSF filed its action for condemnation and the date of the taking. The court did not abuse its discretion in granting a new valuation date.

¶ 85                                    *2. Jury Verdicts*

¶ 86    Finally, BNSF asks this court to vacate and reverse the final judgment orders with instructions for the trial court to substitute the jury awards for the stipulated October 2014 values. We will not vacate a jury verdict unless the verdict is contrary to the manifest weight of the evidence. *Stanford v. City of Flora*, 2018 IL App (5th) 160115, ¶ 32. A verdict is against the manifest weight of the evidence when, after viewing the evidence in the light most favorable to the determination, we conclude that no rational trier of fact could have made the same finding. *Briggs v. State*, 323 Ill. App. 3d 612, 618 (2001).

¶ 87    At trial, each party called two appraisers to testify. The jury rendered verdicts at a value higher than to what BNSF appraisers testified and lower than Grohne's appraisers' estimates. The verdicts bear a reasonable relationship to the evidence presented at trial. See *City of Flora*,

2018 IL App (5th) 160115, ¶ 32. The jury verdicts were not against the manifest weight of the evidence.

¶ 88                                    III. CONCLUSION

¶ 89        For the foregoing reasons, we affirm the judgment of the circuit court of Will County.

¶ 90        Affirmed.

¶ 91        JUSTICE WRIGHT, concurring in part and dissenting in part:

¶ 92        I write separately because I believe the majority's holding creates a dangerous precedent and relegates Grohne's property rights to an inferior position in relation to BNSF and RidgePort's private economic interests. In particular, the majority's holding is contrary to the legislative intent of the Act. This decision creates a template for other private industries to surreptitiously acquire land, against a landowner's wishes, for private purposes. For this reason, I dissent from a decision that ignores BNSF's subterfuge and fails to employ a strict construction of the Act.

¶ 93        As will be discussed in detail below, I agree Grohne failed to show the takings of Grohne South and CTT were not primarily for the public benefit. However, unlike the majority, I am convinced that Grohne rebutted the presumption of necessity and revealed BNSF's taking was excessive.

¶ 94        For the sake of simplicity, I will address each issue in the same order and with the same headings as the majority opinion.

¶ 95                                      II. ANALYSIS
¶ 96                                    A. Grohne's Appeal
¶ 97                    1. *Will County Case No. 14-ED-65 (Grohne North)*
¶ 98        I concur with my esteemed colleagues in the majority that the trial court's decision to limit the scope of Grohne's cross-examination was not an abuse of discretion.

¶ 99          2. *Will County Case Nos. 14-ED-66 (Grohne South) and 14-ED-67 (CTT)*
¶ 100                          a. Traverse and Motions to Dismiss
¶ 101                              i. General Legal Principles
¶ 102       Certainly, I agree that BNSF is entitled to the rebuttable presumption contained in section 5-5-5(c)(9). See 735 ILCS 30/5-5-5(c)(9) (West 2014). Thus, under the Act, it is presumed that BNSF has the limited, statutory authority to condemn private property if the taking is *primarily* for the public benefit, use, or enjoyment and *necessary* to the primarily public purpose. *Id.* However, unlike the majority, I am unconvinced Grohne's burden of proof, needed to rebut the statutory presumption, is the clear and convincing standard, rather than something less. Regardless, this disagreement regarding the correct burden of proof is inconsequential to my dissent. By either standard, I am convinced Grohne rebutted the presumption's necessity prong.

- 14 -

¶ 103                              ii. Primary Public Benefit, Use, or Enjoyment

¶ 104       I agree with the majority's analysis and conclusion that Grohne failed to show the takings of Grohne South and CTT were not *primarily* for the public benefit, use, or enjoyment of constructing and operating an intermodal facility.

¶ 105                              iii. Necessary for a Public Purpose

¶ 106       Contrary to the majority's position, I would hold that Grohne successfully rebutted the presumption of necessity contained in section 5-5-5(c)(9). Grohne's evidence establishes that 4 out of the 71.049 acres taken from Grohne South and CTT were not presently necessary for the intermodal facility *at the time of this taking*. I observe that the four-acre strip taken from Grohne would be immediately put to use by BNSF to complete the spur track. However, it might take much more time before the remaining acreage is used for the intermodal facility. BNSF had a present need to acquire these four acres as promised in the letter agreement. The record makes it clear to me that BNSF's only present need was to fulfill a promise to finish the spur track.

¶ 107       For purposes of this appeal, using a backwards analysis, BNSF urges our court to recognize that the completed spur track was currently necessary to relieve some hypothetical future congestion on the main line. Yet, at the time of this taking, the industrial park had only a handful of tenants and there was no congestion on the main line. A taking is not "necessary" as required by the Act, when the purported need is based solely on speculation. I conclude that this taking of four acres was needed to finish the spur track but was not necessary to complete the intermodal facility.

¶ 108       In support of my view, I point to the testimony presented at the traverse hearing. During the hearing, Hovland, Irving, and Gordon testified that the private spur track project was *presently* unnecessary for, separate from, and/or unrelated to the plans for the intermodal facility project. Further, Gordon made it clear that the private letter agreement, which outlined BNSF and RidgePort's roles in acquiring the land and paying for the private spur track, was in place before the traverse hearing was held.[2] Most tellingly, before BNSF knew whether it could condemn Grohne's property, RidgePort began advertising the existence of a private spur track that would link RidgePort's prospective customers or tenants to BNSF's main line.

¶ 109       Gordon carefully explained to the trial court that the private spur track was to be constructed in phases, and the construction of certain phases of the private spur track would not be finalized until Grohne South and CTT were titled to BNSF. I cannot ignore that before the traverse hearing took place for the intermodal facility project, BNSF had already devoted $20 million to the private spur track project. It makes little sense for BNSF to claim the private spur track project was necessary to the intermodal facility project, when the private spur track project was leaps and bounds ahead of the intermodal facility project. To me, these facts indicate the private spur track was moving full steam ahead and was the driving force behind this taking rather than the intermodal facility. I suggest that even if BNSF abandoned the plan for the intermodal facility, the spur track project would *not* be cast aside by BNSF for any reason.

---

[2]The record does not include a copy of the letter agreement. However, the testimony of Gordon seems to indicate the letter agreement had a date of December 11, 2014, which was after the resolution of necessity was approved and before the traverse hearing was held.

¶ 110     Unlike the majority, I conclude Grohne presented credible, compelling, and unrefuted evidence from the BNSF executives that BNSF always had two separate plans for Grohne's land. I agree one plan would *primarily* benefit the public. However, the public benefit from an intermodal facility was not the primary reason BNSF chose this location for the new facility. I contend that the second plan, completing the spur track, was the reason BNSF selected this location for the intermodal facility. This second plan to complete the private spur track linking RidgePort to BNSF's main line was the primary reason BNSF picked this location. At the time the resolution was enacted, the second plan would solely advance the mutual, private economic interests of BNSF and RidgePort.

¶ 111     Having concluded Grohne rebutted the present necessity prong of the presumption contained in section 5-5-5(c)(9), I now consider an additional step under the Act that was not necessary for my friends in the majority to address. See *id.* In particular, I consider what steps remain available to BNSF with respect to this four-acre strip, within the lawful parameters of the Act.

¶ 112     In my view, once Grohne rebutted the statutory presumption, the burden shifted to BNSF under the Act's "default provision." See *id.* § 5-5-5(c). BNSF was now required to show by clear and convincing evidence that its acquisition of property would be primarily for the benefit, use, or enjoyment of the public *and necessary* to the public purpose of constructing and operating an intermodal facility. *Id.* In other words, BNSF was required to start anew under the Act and make a showing of what is required when a party is not initially entitled to the same rebuttable presumption afforded to BNSF. *Id.*

¶ 113     Before embarking on this analysis, I will briefly discuss the history of the Act. In response to *Kelo v. City of New London*, 545 U.S. 469 (2005), our General Assembly reconsidered the concept of public takings, "particularly in the context of takings from private landowners to other private individuals or groups." 94th Ill. Gen. Assem., House Proceedings, Apr. 19, 2006, at 12 (statements of Representative Bradley). The result of our legislature's efforts was the consolidation of all eminent domain or condemnation proceedings into one statute, the Act, which goes beyond the context of public takings and instead "deals with all aspects of eminent domain." *Id.* In particular, during the House of Representatives proceeding, it was stated that the Act intended to deliver two "substantial wins" for private landowners in Illinois. *Id.* at 13.

¶ 114     First, section 5-5-5(c), the Act's "default provision," assigned the clear and convincing evidentiary standard to a "condemning authority *** want[ing] to condemn property *** *when none of the exceptions applies*." (Emphasis added.) *Id.*; see 735 ILCS 30/5-5-5(c) (West 2014). As stated above, I believe this provision applies because Grohne rebutted the statutory presumption found in section 5-5-5(c)(9). Second, the legislature "shifted the burden of proof to the condemning authorities." 94th Ill. Gen. Assem., House Proceedings, Apr. 19, 2006, at 13 (statements of Representative Bradley); see 735 ILCS 30/5-5-5(c) (West 2014). I contend the majority misreads the Act and misunderstands the protections it was meant to afford landowners.

¶ 115     The "substantial wins" resulting from the Act staunchly protected landowners from unlawful takings in *all* eminent domain contexts. The House of Representatives sponsor, Representative John E. Bradley, specifically asked his colleagues for an " 'aye' vote" to "swing the pendulum back in favor of the private individual landowner." 94th Ill. Gen. Assem., House Proceedings, Apr. 19, 2006, at 13-14 (statements of Representative Bradley). As a clear sign of this effort, our legislature explicitly directed that "[t]his Act shall be strictly construed as a

limitation on the exercise of eminent domain powers." 735 ILCS 30/90-5-15 (West 2014). Moreover, our legislature stated section 5-5-5 was a limitation on eminent domain powers but "not an independent grant of authority" to exercise those powers. *Id.* § 5-5-5(g). Thus, public and private condemning authorities must still satisfy section 5-5-5's procedural safeguards and requirements.

¶ 116       As a result of the clear legislative intent and directives, I conclude this court must reverse the denial of Grohne's traverse and motions to dismiss because BNSF did not meet the clear and convincing standard found in the Act's "default provision." See *id.* § 5-5-5(c). Specifically, I disagree that BNSF demonstrated the acquisition of the *entire* parcel of 71.049 acres from Grohne South and CTT was necessary and not excessive for purposes of the intermodal facility. It should be recognized that this is not a traditional case of excessiveness, where we simply do the math to assess whether the taking is "grossly in excess" of what would be necessary to accomplish the condemning authority's stated public purpose. *Vaccarro*, 408 Ill. at 597. Instead, this is a case where it has been made clear that a *present* and nonspeculative necessity does not exist for the private spur track project, particularly where the resolution of necessity does not make a specific reference to the partially completed private spur track.

¶ 117       It is true, as the majority states, "where the legislature has delegated to a corporation the authority to exercise the power of eminent domain, the corporation has also the authority to decide on the necessity for exercising the right, and its decision will be conclusive in the absence of a clear abuse of the power granted." (Internal quotation marks omitted.) *City of Chicago v. Midland Smelting Co.*, 385 Ill. App. 3d 945, 965 (2008); see also *Goldman*, 35 Ill. 2d at 453; *Vaccarro*, 408 Ill. at 597 (abuses of the eminent domain authority "will not be tolerated, and if no necessity for its exercise exists, or if it appears that the quantity of the property sought to be taken is grossly in excess of the amount necessary for the public use, the court will not permit the land to be taken").

¶ 118       I would hold, under the Act's necessity prong, this case documents a "clear abuse of the power granted" to BNSF. (Internal quotation marks omitted.) *Midland Smelting Co.*, 385 Ill. App. 3d at 965. Contrary to the clear instructions from our lawmakers that the Act must be "strictly construed," the private spur track project has been allowed to leach onto what is otherwise *a primarily* public and necessary intermodal facility project to increase BNSF's taking while serving two purposes. BNSF has misused the Act by camouflaging the four excessive acres, now taken from an unwilling landowner, by packaging those acres onto the same footprint of the intermodal facility that was still being planned on the back of a napkin.

¶ 119       In my opinion, we should not turn a blind judicial eye to BNSF's "end around" approach to the Act. In the absence of the four additional acres, I would have no difficulty deferring to the legislature's grant of the eminent domain authority to BNSF for its nonspeculative, future anticipated uses of Grohne South and CTT. See *id.* However, due to the absence of a clearly definable present and nonspeculative purpose for the private spur track set out in the resolution of necessity, I do not believe any deference to BNSF is appropriate pursuant to the Act.

¶ 120       Here, the Board's resolution of necessity for the intermodal facility project clearly defines the reason for the proposed taking was "to *provide access to the [intermodal] facility* from both ends to facilitate safe and expeditious operation of the main line." (Emphasis added.) Similarly, the intermodal facility would "allow trains to be taken off the main line, and broken down, for further handling by BNSF." Yet, the private spur track was not expressly referenced in the resolution of necessity and does not provide access to the intermodal facility at all.

Similarly, the unmentioned private spur track will not be used to allow trains to be taken off the main line and "broken down for further handling *by BNSF*."

¶ 121 Thus, I would hold deference to BNSF is not warranted in this case, where this plan is *primarily* for the public but was merged with a plan that selfishly serves private interests alone. This constitutes misuse of the Act. The majority creates a dangerous precedent that paves the way for private condemning entities to successfully and creatively evade legislative limitations. Indeed, deferring to a section 5-5-5(c) entity, such as BNSF, under the circumstances here, constitutes a relinquishment of a judicial task of ensuring the Act is "strictly construed" to limit the eminent domain powers of private entities. See 735 ILCS 30/90-5-15 (West 2014). In my opinion, the unnecessary private spur track cannot bootstrap itself to the necessary intermodal facility project. The two plans are presently unnecessary, separate from, and unrelated to each other. The temptation of section 5-5-5(c) entities to resort to similar future tactics must be renounced before momentum is gained in practice.

¶ 122 My position is also not without a sound basis in the case law preceding the Act. In the past, railroad companies were prohibited from condemning private property to construct a spur track connecting particular industries to a railroad's main line, when such action would be solely for the private but mutual benefit of the industrial customers of the railroad and the railroad company itself. *Limits Industrial R.R. Co.*, 321 Ill. at 107. In fact, "[i]t has been held a number of times that the right of eminent domain cannot be exercised for the purpose of acquiring land for a private switch from an industry to the main line of a railroad." *People ex rel. Tuohy v. City of Chicago*, 394 Ill. 477, 482 (1946).

¶ 123 As an aside, I note that the trial court astutely questioned whether a court may reduce or change the boundaries of the tracts BNSF hoped to acquire in order to eliminate any misuse of the eminent domain authority. Logically, decreasing the boundaries of the proposed taking by four acres might cure the abuse of that power. However, this court, like the trial court, questioned the parties on this possibility and received the agreed response that the case law supports an all-or-nothing approach. Since I conclude BNSF should have requested four acres less, the all-or-nothing approach results in BNSF taking nothing from Grohne.

¶ 124 For the foregoing reasons, I respectfully dissent from the majority's application of the rebuttable presumption to the facts in this case. I would hold that Grohne rebutted the presumption of necessity and BNSF failed to meet theirs.

¶ 125 I would also hold that unlawfully expanded takings, of the sort presented in this case, should be viewed as both excessive and unnecessary no matter how small in size the expansion is when compared to the totality of land properly taken. I would reverse the trial court's order denying Grohne's traverse and motions to dismiss due to BNSF's clear abuse of the authority granted under section 5-5-5(c).

¶ 126 While my holding would be limited to this case, I am unaware of any scenario where the separate and unrelated projects of a section 5-5-5(c) entity, one which is legitimately for the public and the other which is not necessary to any present or nonspeculative public purpose, is anything other than excessive. My reversal of the court's ruling on the traverse and motion to dismiss would render Grohne's remaining issues, and BNSF's cross-appeal, moot.